**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-392-2 (RCL)** |
| **RUSSELL TAYLOR,** | |
| **Defendant.** | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum for defendant Russell Taylor, who pleaded guilty to conspiring to obstruct Congress's official proceeding on January 6, 2021.

This Court has aptly explained that "[i]n any angry mob, there are leaders and there are followers." On January 6—and, just as importantly, in the weeks leading up to January 6—Taylor was a leader. He organized a "group of fighters" to travel to Washington D.C. to obstruct Congress's certification of the 2020 Presidential Election. He called on his followers to "[m]arch into the Capitol Jan 6." And Taylor led not just by words, but by deeds. On January 6, Taylor, while wearing an exposed knife on top of a bullet proof chest plate and carrying bear spray, a hatchet, and other weapons in his backpack, led a mob that overran a police line on the inaugural stage and stormed the Capitol.

After being charged with multiple felonies alongside five co-defendants, Taylor pleaded guilty and accepted responsibility. Taylor also publicly agreed to assist the Government—most

1

notably testifying in the trial of Alan Hostetter.[1]

For the reasons set forth herein, the Government requests that this Court sentence Russell Taylor to 52 months' imprisonment. This sentence represents a 40% downward departure from the top of the otherwise applicable Guidelines range. The Government's recommendation balances the seriousness of the offense, which is closely comparable to the offense conduct of Hostetter and which drives the Government's determination of the otherwise applicable Guidelines range, and Taylor's acceptance of responsibility and substantial assistance to the Government, which determines the applicable downward departure.

## I.     FACTUAL BACKGROUND

The gravity of the January 6, 2021 attack on the United States Capitol is well understood by this Court, and it is against this backdrop that Taylor's leadership and dangerous conduct must be evaluated.

### A.     Taylor's Role in the January 6, 2021 Attack on the Capitol

The defendant Russell Taylor conspired with Alan Hostetter and others to obstruct the certification of the electoral college vote. The Court is familiar with the details of the defendant's conduct from his trial testimony in *United States v. Hostetter*. The Government highlights key

---

[1] To the extent that this memorandum discusses certain aspects of the defendant's cooperation that have not been publicly disclosed, the Government seeks leave to file a redacted version of this memorandum on the public docket and will separately move to file the unredacted memorandum under seal.

elements below.[2]

### *Preparing for a Show of Force After the 2020 Election*

Taylor and Hostetter served together on the board of the American Phoenix Project, an organization that Hostetter founded. The organization originally focused on protesting local government policies in California related to Covid-19, but shifted its focus to the 2020 presidential election. After then-President Trump lost the 2020 election, Taylor and Hostetter discussed how to respond, and Taylor asked: "How do we have a show of force? Motorcade? Rally? Riot?" Exhibit 908.04.

As January 6 drew closer, Hostetter repeatedly called for violence and a show of force. *See, e.g.*, Exhibit 305 (Hostetter: "Some people, at the highest levels, need to be made an example of, with an execution or two or three."); Exhibit 604.13 (Hostetter calling for executions). Taylor was aware of Hostetter's pronouncements. For example, during an election-related rally on December 12, 2020, Hostetter—flanked by Taylor—gave another speech calling for the execution of his perceived political enemies. Exhibit 307 ("President Trump must be inaugurated on January 20th . . . The enemies and traitors of America, both foreign and domestic, must be held accountable. And they will. There must long prison terms, while execution is the just punishment for the ringleaders of this coup.").   Despite Hostetter's repeated calls for the most extreme forms of political violence, Taylor continued to work closely with him, including in their plan to storm the Capitol.

---

[2] Citations to exhibits numbers or trial testimony are drawn from the *United States v. Hostetter*, 21-cr-392-1 (RCL), trial unless otherwise noted.

On December 16, 2020, Hostetter made an Instagram post from the account of the American Phoenix Project, writing, "The time has come when good people may have to act badly...but not wrongly." Exhibit 515. The post featured a photo of Hostetter standing with Taylor and a third individual, Morton Irvine Smith, with Hostetter and Taylor both holding hatchets that Taylor had given them. *Id.*; *see also* July 7 Trial Tr. 86:2–88:2.



*Exhibit 515 (from left to right, Smith, Taylor, and Hostetter)*

On December 19, 2020, when then-President Trump sent out the "wild protest" Tweet related to January 6, Taylor and Hostetter immediately began planning to come to D.C. Taylor renamed one of the Telegram groups that he operated (discussed further below) "California Patriots—Answer the Call Jan 6" to focus the group explicitly on answering then-President Trump's call for his followers to come to Washington D.C. on January 6.

### The DC Brigade and Other Telegram Groups Organized by Taylor

While Hostetter was the public face of the American Phoenix Project, Taylor worked to

4

organize others to undertake anti-government conduct in California and ultimately in Washington D.C. Taylor's communications often called for property destruction and political violence. For example, Taylor created the "California Patriots—Spec Ops" Telegram group to organize "Patriots that are ready to function as operators of disruption against Tyranny" with the goal "to remove authority." Exhibit 905. In this group, Taylor made plans to "disable the vehicles" of city workers through "[flat tires and broken windows," and to smash windows at Facebook's offices, all while disguising their actions as those of Antifa. As Taylor wrote, "let [Antifa] get the credit." Exhibit 905.02; *see generally* July 7 Trial Tr. 82:10–85:9. Taylor also operated another Telegram group, "So Cal Patriots," in which Taylor called for violence against political leaders. He posted that the governor of California "[n]eeds to be drug out on the street," and that group members should "[s]torm" the California state capitol building. Exhibit 901.03; *see generally* July 7 Trial Tr. 57:25–62:19.[3]

As January 6 approached, Taylor encouraged participants to attend, and Taylor spoke of "breach[ing] the doors" of the Capitol in Washington, D.C. Exhibit 902.06 ("I personally want to be on the front steps and be one of the first ones to breach the doors!"). Another group member added, "I like it. Be the first ones to storm the Capitol. Go BIG or go home." *Id.* Taylor encouraged others to not just attend the Washington, D.C. events, but to bring weapons. *See* Exhibit 903.02;

---

[3] Taylor organized another Telegram group, titled "IYCKI chat," in December 2020, which was to be "combat centric." In this group, Taylor also discussed his plans for January 6. On December 21, 2020, another individual in the group wrote, "I have a feeling it's going to get serious on January 6th . . . . I'm hoping these people storm the senate!" Taylor responded, "I'll be in the steps on the senate . . . join us."

*see generally* July 7 Trial Tr. 98:10–102:11, 113:21–115:9.

And Taylor prepared the group for violence. Indeed, Taylor specifically organized a Telegram group that he called "The California Patriots—DC Brigade" for those "that are traveling to DC for Jan 6th event that are comfortable with violence." Exhibit 903.03; 904.01. Taylor called these men a "group [of] warriors." *Id.* In his first messages to the dozens of members in the group, Taylor stated, "[t]his thread is exclusive to be utilized to organize a group of fighters." Exhibit 904.03. He told the group to be prepared for battle by collecting weapons: "I am assuming that you have some type of weaponry that you are bringing with you and plates as well." *Id.* He wrote, "[i]nitially our intent is not to go after and seek violence," but he explained, "[a]s we are on site and events begin to unfold that may change." *Id.*

Members of the group received the message.[4] They discussed their expectation for violence on January 6. One member wrote:

> I am going to dc for rally not to talk but to take care of business, time for talking is over! This is tyranny and our constitution states we can put bitches 6ft deep! Let's do it! There are not enough cops to stop us!

Exhibit 904.04. Another member introduced himself and added, "[d]iplomatic on occasion, less likely this time. Armed." Exhibit 904.01. Kinnison introduced himself, Warner, Martinez, and Mele as "so cal 3%," noted that they "train with each other," and that they would be bringing "lots of gear," including "bear spray, knives, flags, plates[,] goggles, helmets." *Id.* In a sign that he knew

---

[4] Taylor's coconspirators and codefendants—Alan Hostetter, Erik Scott Warner, Felipe Antonio "Tony" Martinez, Derek Kinnison, and Ronald Mele—were all members of this "group of fighters," as were additional January 6 defendants, including Jeffrey Brown (21-cr-178), Ben Martin (21-cr-562), Siaka Massaquoi (23-cr-421), Joshua Youngerman (23-cr-469), and Theo Hanson (24-cr-57).

what they were planning was unlawful, Kinnison wrote, "we should clear all text in this chat the morning of the 5th just in case for opsec purposes." *Id.*

### Taylor and Hostetter's Agreement To Transport Weapons to D.C.

Hostetter drove to Washington, D.C. for the events on January 6. Just as Taylor and Hostetter had done in November 2020, Hostetter drove cross-country so that he could load his car with weapons for himself and Taylor, who flew. *See* Exhibit 909.06 ("I can take your hatchets again!"); Exhibit 918 ("Unloaded all my gear, Russ's gear, Morton's gear and your step mama's gear!"). Taylor's weapons and tactical equipment included hatchets, a taser, stun batons, bear spray, tactical gloves, a helmet, and a plate carrier vest with bullet proof plates, which Taylor captured in the following picture:



*Exhibit 516 (photograph taken by Taylor from his hotel room)*

***Taylor and Hostetter's Speeches on January 5:***
***"We Will Not Return To Our Peaceful Way of Life Until This Election Is Made Right"***

On January 5, 2021, both Taylor and Hostetter gave speeches to a large crowed outside the

U.S. Supreme Court at a rally hosted by the American Phoenix Project and another group. Taylor

stated in his speech:

> I stand here in the streets with you in defiance of a communist coup that is
> set to take over America. But we are awake and we are never going back to
> sleep. We are free Americans and in these streets, we will fight and we will
> bleed before we allow our freedom to be taken from us. We declare that we
> will never bend a knee to the Marxists within Antifa, to the tyrannical
> Democrat governors who are puppets, and to the deep state commie actors
> who threaten to destroy America.... But now these anti-Americans have
> made the fatal mistake, and they have brought out the Patriot's fury onto
> these streets and they did so without knowing that we will not return to our
> peaceful way of life until this election is made right, our freedoms are
> restored, and America is preserved.

Statement of Offense (herein, "Taylor SOO"), ECF No. 197 at ¶ 26. As Taylor looked on, Hostetter

delivered a speech that also was filled with violent rhetoric that he directed squarely at the nearby

United States Congress, which he referred to as "the people's house." He declared: "Dominion

and all the fakes and frauds, led by these vipers behind you in the people's house. They're gonna

hear our voice tomorrow. They're gonna hear us loud and clear. We are at war in this country! We

are at war." Exhibit 310. Hostetter continued, "[o]ur voices tomorrow are going to put the fear of

God in the cowards and the traitors, the RINOs and the communists of the Democrat Party, they

need to know we as a people, 100 million strong, are coming for them if they do the wrong thing!"

*Id.* He concluded, "I will see all tomorrow at the front lines. We are taking our country back!" *Id.*

### January 6, 2021: The Attack on the U.S. Capitol Building

Taylor and Hostetter met at their hotel early on the morning of January 6, 2021.  July 7

Trial Tr. 152:21–156:15. As they spoke, Taylor and Hostetter showed each other the weapons that they were carrying, including the hatchets that they both had in their backpacks at the time. *Id.* Hostetter and Taylor joined other members of their DC Brigade Telegram group and headed to the Ellipse for the speeches planned that morning. Taylor wore a plate carrier with bullet proof plates and an exposed knife on his chest, and carried other weapons in his backpack.

After watching the speeches near the Ellipse, Hostetter and Taylor joined others in walking to the Capitol. As they approached the Capitol grounds, Taylor, standing next to Hostetter, recorded a video of himself and said, "we are converging on the Capitol." Exhibit 409. He added, "I heard something . . . indicating that the barricades have been breached," and "we'll see if the Capitol Police are oath keepers of the Constitution." *Id.* At that point, Taylor received a message from someone remotely viewing his video live, and he announced, "[they] said the barricades have been breached." *Id.*; July 7 Trial Tr. 169:9–15. Hostetter confirmed the information from Taylor, and added, "I hear sirens." Exhibit 409. Taylor read out the next update, "They are storming the Capitol." Hostetter laughed when he heard it, and replied, "May it be true!" *Id.*

As they entered the restricted Capitol grounds, Taylor and Hostetter approached the police line on the west plaza area of the Lower West Terrace. *See* July 7 Trial Tr. 173:9–25. They observed chemical agents and heard concussive pepper ball grenades being deployed. Hostetter and Taylor nevertheless advanced on the Capitol. They climbed into the temporary scaffolding covering the Northwest Stairs and proceeded to the Inaugural Stage. There, they encountered a line of police officers who were holding back the rioters from advancing onto the Inaugural Stage. From their position overlooking the west plaza, Taylor and Hostetter saw the police line on the

west plaza fall, as rioters overran the police and forced them to retreat. *See* Exhibit 404; July 7 Trial Tr. 184:9–18; July 12 Trial Tr. 158:11–159:15. Taylor cheered the rioters on, shouting "move forward, Americans!" Hostetter celebrated, "this is how it fucking works!" *Id.*; July 7 Trial Tr. 186:4–10.

Taylor then turned to the police stationed on the Inaugural Stage and shouted, "last chance, boys! Move back! Move back!" Taylor SOO at ¶ 32. Taylor then pushed against the police line, contributing to its collapse. Exhibit 404. In the image below, Taylor (indicated in yellow) can be seen pushing against the police line, while Hostetter (indicated in red)—who in a video recorded in November 2020 referred to Taylor as his "blocking back"—follows behind.



*Exhibit 313.01 (Taylor and Hostetter Advancing to the Inaugural Stage)*

In response to the rioters' push against them, the officers on the Inaugural Stage tried to retain control, and one deployed pepper spray directly in Taylor's face. Taylor retreated only briefly and then advanced again, with Hostetter in tow, proceeding up the stairs toward the Upper West Terrace.

Hostetter and Taylor next ascended to a set of bleachers overlooking the Inaugural Stage. There, another rioter exclaimed, "they're going inside!" Exhibit 602.75. Hostetter, who was recording a video at the time, said, "we hear they're going inside," as Taylor called out to the crowd, "inside!" *Id.* Hostetter and Taylor then moved toward the Capitol building.

Hostetter and Taylor descended from the bleachers overlooking the Inaugural Stage and walked up to the Upper West Terrace Door, where they saw other rioters entering the Capitol building. July 10 Trial Tr. 11:6–14:6. They reached the steps leading up to the door, before stopping and turning away as police began visibly converging on the door. *See* Exhibits 319; 203.01; July 10 Trial Tr. 16:8–17:2. Hostetter and Taylor then decided to stay outside of the Capitol building to decrease their risk of being arrested; Taylor understood that the exposed knife on his chest would have made him a target for police if he entered the inside, while the police stationed outside the building were far too outnumbered to make arrests. *See* July 10 Trial Tr. 21:22–22:8.



*Exhibit 409, United States v. Warner et al. (Taylor's exposed knife indicated in red)*

11

Hostetter and Taylor remained on the Upper West Terrace for hours. They met up with other members of the DC Brigade Telegram group, including co-defendants and co-conspirators Derek Kinnison and Tony Martinez. *See* Exhibit 519; July 10 Trial Tr. 22:11–23:23. Hostetter and Taylor only left the Upper West Terrace when forced to do so by police officers who forcibly cleared the area. July 12 Trial Tr. 168:15–17. As police tried to clear the area, Taylor at times was directly against the police line and needed to be physically pushed away by the police. He shouted at the police, "1776! Choose a side!" Taylor SOO ¶ 36. He added, still yelling at the police, "you will be defined by this moment!" and "You know what you want to do! Stand down! This is your last chance, boys!" Exhibit 326.01; Taylor SOO ¶ 36.

After the riot, Taylor returned to the groups he had organized to celebrate. Taylor sent a message to the So Cal Patriots Telegram group: "I was pushing through traitors all day today. WE STORMED THE CAPITAL! Freedom was fully demonstrated today!" Taylor SOO ¶ 38.

## II.     THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Taylor with five counts: Count One (Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k)); Count Two (Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2); Count Three (Obstruction of Law Enforcement during Civil Disorder and Aiding and Abetting, in violation of 18 USC §§ 231(a)(3) and 2); Count Four (Entering and Remaining in a Restricted Building and Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A)); and Count Five (Disorderly and Disruptive Conduct in a Restricted Building and Grounds with a Deadly or

Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)). ECF No. 89. On April 19, 2023, Taylor pled guilty to Count One of the Superseding Indictment. Minute Entry (Apr. 19, 2023); ECF Nos. 196, 197, 198.[5]

### III.   STATUTORY PENALTIES

Taylor now faces sentencing on Count One, Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k). As noted by the plea agreement and the Presentence Report, Taylor faces a maximum sentence of 20 years' imprisonment, three years' supervised release, a fine of $250,000, and a $100 special assessment. ECF No. 196 ("Plea Agreement"); ECF No. 439 ("PSR") at ¶¶ 19, 155, 175.

### IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS – *BEFORE* THE GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE FOR TAYLOR'S SUBSTANTIAL ASSISTANCE

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The calculation of the applicable Guidelines range here is made more complex due to the D.C. Circuit's intervening decision in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024). That is, in April 2023 the parties entered into a plea agreement that included two Specific Offense Characteristics (totaling 11 points) that have since been invalidated by *Brock*. As discussed in more

---

[5] On May 10, 2023, a federal grand jury returned a Second Superseding Indictment charging Taylor's five original co-defendants with the same charges set forth in the Superseding Indictment and, with respect to Hostetter, additional felony enhancements for two previously charged misdemeanors. ECF 210. Taylor was not charged in the Second Superseding Indictment because he had already pleaded guilty to Count One of the Superseding Indictment.

detail herein at Part IV.C., the Government maintains that following *Brock* the Court should incorporate a significant increase (i.e., 11-point increase) when calculating the applicable Guidelines range to account for Taylor's conduct. The Government asserts that this increase can be accomplished through the application of an upward departure pursuant to U.S.S.G. § 5K2.7.[6] The Court could also address this increase through the application of the Section 3553 factors. *See United States v. John Sullivan*, 21-CR-078 (RCL). In either scenario, the Government submits that the applicable Guidelines range for Taylor should be 70 – 87 months based on an offense Guideline of 27.

The Sentencing Guidelines calculation reflected in the plea agreement executed by the parties (with the two offense characteristics invalidated by *Brock* shown in italics) is as follows:

PLEA AGREEMENT Count One: (18 U.S.C. § 1512(k))

| U.S.S.G. § 2J1.2 | Obstruction of Justice Base Offense Level | **14** |
| *U.S.S.G. § 2J1.2(b)(1)(B)* | *Causing or threatening to cause physical injury to a person* | *+8* |
| *U.S.S.G. § 2J1.2(b)(2)* | *Substantial interference* | *+3* |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation[7] | +2 |
| U.S.S.G. § 3B1.1(b) | Aggravating Role | +3 |

---

[6] Taylor's plea agreement specifically contemplates that either party could seek a departure at sentencing. Plea Agreement at 4.

[7] A two-level increase enhancement applies if the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). The parties agreed in the plea agreement that this enhancement applies to Taylor, Plea Agreement at 3, and Probation has recommended its application. PSR ¶ 85. Taylor took a lead role in organizing multiple Telegram groups to gather a group of fighters prepared for violence on January 6, 2021. Exhibit 904.03; July 7 Trial Tr. 123:22–25. Many of the participants in those Telegram groups organized by Taylor put their encrypted words into consequential action by traveling to Washington D.C. armed for battle and storming the Capitol. Moreover, Taylor engaged in extensive planning with Hostetter to arrange for Hostetter to transport his hatchets, taser, bullet proof plates, and other gear to Washington, D.C. for January 6. July 14 Trial Tr. 84:17–85:05. Based on Taylor's extensive preparation in to organizing a "group of fighters" on encrypted communications, and his extensive preparation to arrange for transportations of weapons cross-country, the Court should apply the enhancement.

14

| | | |
|---|---|---|
| U.S.S.G. § 3E1.1(a), (b) | Acceptance of Responsibility | **- 3** |
| | Total | **27** |

The Government asserts that the *same offense level calculation* is warranted and can be achieved by the Court at sentencing through the application of U.S.S.G. § 5K2.7 and imposition of an upward departure of 11 points (or, in the alternative, a Section 3553(a) variance consistent with an 11-point increase). The calculation of such application is reflected below:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Obstruction of Justice Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | **+2** |
| U.S.S.G. § 3B1.1(b) | Aggravating Role | **+3** |
| *U.S.S.G. § 5K2.7* | *Significant disruption of a government function* | ***+11*** |
| U.S.S.G. § 3E1.1(a), (b) | Acceptance of Responsibility | **- 3** |
| | Total | **27** |

As discussed in more detail in Part V, the Government moves this Court, pursuant to U.S.S.G. § 5K1.1, to depart downward from Offense Level 27 (as calculated in this Part IV) to account for Taylor's extensive cooperation and substantial assistance to the Government.

**A. The Parties' Disputed Guidelines Application**

At the time of the plea agreement, the parties estimated Taylor's total offense level (before applying the acceptance of responsibility reduction) to be either 27 (as estimated by the defendant) or 30 (as estimated by the Government). The parties only dispute in the calculation of the Guidelines range in the plea agreement was the application of U.S.S.G. § 3B1.1(b) for aggravating role. ECF No. 196 at 2-3. Probation has recommended the application of this enhancement to Taylor. PSR ¶ 87. The Government asserts that this enhancement applies here.

A three-level enhancement is applicable if the defendant was a "manager or supervisor" in a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G.

§ 3B1.1(b). The following list of non-exhaustive factors are instructive in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.*

As the Court found in the Hostetter trial, "Mr. Hostetter and Mr. Taylor conspired together to obstruct and impede the Electoral College Certification," which reflects the serious nature and scope of their illegal activity. July 14 Trial Tr. 83:24–84:01. Further, Taylor acted as a supervisor and recruiter in this conspiracy, as shown by his establishment of Telegram groups, including the DC Brigade, which organized "a group of fighters" to travel to Washington D.C. Taylor SOO ¶ 18. The members of the "DC Brigade" Telegram group that Taylor recruited "were on Capitol grounds on January 6th," "entered the U.S. Capitol building," and "engaged in assaultive conduct on Capitol grounds on January 6th." July 11 Trial Tr. 116:1–15.

Because Taylor took on a leadership role with respect to the conduct of the DC Brigade, the three-point enhancement for aggravating role is appropriate.

### B.  The Adjustment for Zero-Point Offenders Does Not Apply

The U.S. Probation Office calculated Taylor's criminal history as category I, which is not disputed. PSR at ¶ 97. However, Section 4C1.1 does not apply here because Taylor carried a knife when he stormed the Capitol. PSR ¶ 93; see also U.S.S.G. § 4C1.1(a)(7) (the adjustment is not

applicable if the defendant "possess[ed], receive[d], purchase[d], transport[ed], transfer[ed], s[old], or otherwise dispose[d] of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense"). Moreover, Taylor's threats to the police line on the Inaugural Stage—"last chance, boys! Move back! Move back!" Taylor SOO at ¶ 32—before he pushed into that police line and was pepper sprayed constituted a credible threat of violence under U.S.S.G. § 4C1.1(a)(3). *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6 (defining a "credible threat of violence" under Section 4C1.1(a)(3) as "a believable expression of an intention to use physical force to inflict harm"); *United States v. Andrulonis,* No. 23-cr-085 (BAH), Sent. Hrg. Tr. at 11–12 ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. . . . So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").[8]

### C.  The Court Should Apply an Upward Departure Pursuant to U.S.S.G. § 5K2.7

Following *Brock*, the enhancements under Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply to convictions for 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1512(k) under these circumstances. In its totality, Taylor's organization of a group of fighters on encrypted communications, transport of weapons through his principal co-conspirator Hostetter, and storming of the Capitol, reflects criminal conduct far more serious than interference with a routine

---

[8] The Court did not apply the zero-point offender to Taylor's co-defendants, all of whom either carried weapons during the offense conduct, made credible threats of violence, or both. *See* Government's Sentencing Memorandum, ECF No. 452 at 46.

court proceeding.[9] *See Brock*, 94 F.4th at 59 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."); *see also* Memorandum Opinion & Order, *United States v. Reffitt*, 21-cr-32, ECF No. 182 at 10 ("Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a 'judicial, quasi-judicial, and adjunct investigative proceedings,' or on the other hand, any other type of formal proceeding. This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of [the defendant's] obstructive conduct."); *United States v. Fonticoba*, 21-cr-368 (TJK), 4/11/2024 Mem. Order at 4–5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Although the D.C. Circuit has held that U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence. *See* Government's Sentencing Memorandum, ECF No. 452 at 40–46.

Here, the Court should apply U.S.S.G. § 5K2.7 (or an equivalent variance under Section 3553(a)) to reflect the seriousness of Taylor's offense, which will bring the Guidelines to the parties' calculation of the Guidelines range in the plea agreement.[10] The offense conduct in every

---

[9] As noted *supra,* Taylor's plea agreement specifically contemplates that either party could seek a departure at sentencing. Plea Agreement at 4.

[10] In the alternative, or in combination, the Government submits that an upward departure pursuant

18

case may not merit the same application of an upward departure or variance consistent with the pre-*Brock* enhancements. But, here, the defendant was an organizing member of a group prepared for violent confrontations in order to stop the certification and transfer of power. The mitigating factors in this case, particularly Taylor's substantial assistance to the Government following his arrest, are discussed *infra*. First, however, the Government must assess the correct Guidelines particularized to the specific case and the specific defendant before assessing any downward departure or variance attributable to substantial assistance.

If the Court were to decline to apply a departure under Section 5K2.7, the Court could in the alternative apply an upward variance under the § 3553(a) sentencing factors to achieve the same result. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). Here, an upward variance (as an alternative to departure) is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As just discussed, Taylor's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. The only reason that Taylor is not subject to eleven levels' worth of

---

to U.S.S.G. § 3A1.4, application note 4 ("Note 4") is also appropriate here because Taylor's conduct was "calculated to influence or affect the conduct of government intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, n.4. In its sentencing memorandum for Hostetter, the Government set forth at length its position on the legal standard for this enhancement. *See* ECF No. 383 at 34–45. The Government incorporates those arguments here as if set forth fully herein. The Court declined to apply Note 4 in connection with Hostetter's sentencing, and the Government respectfully notes its disagreement for purposes of the record and submits that Note 4 could apply to Taylor.

enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding*… [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86–87 (emphasis added). The Government submits that the Court should impose either an upward departure or, in the alternative, vary upwards under the § 3553(a) factors to account for Taylor's serious offense.

The Government asserts that, prior to receiving any credit and downward departure for his substantial assistance, the proper assessment of Taylor's conduct under the Sentencing Guidelines is an offense level 27.

## V. Government's Motion for Downward Departure for Substantial Assistance

The Government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Taylor has provided to law enforcement. The Government submits that a four-level downward departure from the offense level 27 (as set forth in the plea agreement and calculated above in Part IV) is appropriate given the level and nature of assistance Taylor has provided.

The Guidelines provide that, "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In

determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, Taylor's assistance has been significant: Taylor was the first and ultimately only member of the DC Brigade conspiracy group to plead guilty, and he did so in a public cooperation agreement in which he agreed to a robust statement of offense. *See* Taylor SOO. Whereas Taylor's role as a leader before and during January 6 constitutes an aggravating factor in his criminal conduct, his role as a leader also magnifies the importance of his cooperation. Before January 6, Taylor had become well-known by organizing and participating in various events protesting the results of the 2020 election, including his visible presence at the Virginia Women for Trump event on January 5. Thus, after January 6, Taylor's public decision to cooperate with law enforcement

and accept responsibility for his crimes is more impactful than a similar decision by lower profile defendant.

Taylor's primary contribution as a cooperator has been as an important trial witness against Hostetter, who was charged as the lead defendant in the six-defendant "DC Brigade" indictment. Hostetter's culpability is embodied by the 135-month sentence he received. Minute Entry (12/07/2023); ECF Nos. 384, 385. In addition to his trial testimony, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

From his initial proffer through trial, Taylor met with the Government more than half a dozen times for proffer sessions and trial preparation. Taylor made himself available to the Government whenever he was asked to do so. At Hostetter's trial, Taylor testified over the course of two days. The Government admitted approximately 90 exhibits through Taylor, including communications between Taylor and Hostetter describing their coordination for January 6; encrypted chats from Taylor's various groups, including the DC Brigade, showing the participants' plans to bring weapons to DC and their use of violent rhetoric; videos recorded by Taylor and Hostetter on January 6; and third-party video authenticated through Taylor showing Hostetter's crimes (and Taylor's crimes) on January 6. Taylor described the communications between him, Hostetter, and others in the planning leading up to January 6, including their shared motivation to

change the results of the election and the agreement that Hostetter would transport Taylor's weapons. Taylor stood in open court, held up each seized weapon that Hostetter transported for him for January 6 (including the bulletproof plates, taser, stun batons, bear spray, knife, and other weapons described above), and admitted that he carried each item on January 6. He further admitted that Hostetter had transported each item for him knowing they would be carried on January 6.

Taylor also testified that when he was pepper-sprayed by police officers, he knew that he should go no further, and he nevertheless chose to advance. Taylor's testimony at trial that he knew what he did on January 6 was wrong was compelling and credible. The Court, in announcing its verdict, specifically stated three times that it credited Taylor's testimony. July 14 Trial Tr. at 88:02, 100:24, and 101:25.[11]

Taylor's willingness to plead guilty, publicly cooperate, and testify against his closest confederate should not be underappreciated—particularly in an environment in which January 6 defendants are offered tremendous political, media, and financial encouragement to deny their misconduct, and they risk subjecting themselves and their families to significant threats and pressures if they cooperate with the Government. Taylor chose to testify against Hostetter and

---

[11] Taylor did not testify in the separate trial of his other four co-defendants, whose trial was severed from Hostetter's trial. Taylor was willing to testify there and made himself available for trial preparation.

23

never reneged on that commitment, even as Hostetter attacked Taylor personally in public filings and in media appearances.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

Taking all of these factors into account, the Government submits that a 40% downward departure is warranted. Such a departure would reduce Taylor's recommended sentence of 87 months' imprisonment (the top of the otherwise applicable Guidelines range calculated above) to 52 months' imprisonment. The Government submits that such a reduction appropriately reflects

the principles outlined above that this Court should consider in assessing the level of assistance Taylor provided to law enforcement.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of 52 months' imprisonment.

### A.   Nature and Circumstances of the Offense

Taylor's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Moreover, Taylor did not act alone, but rather in organized, pre-planned concert with others. "[P]artnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). The nature and circumstances of Taylor's conspiracy offense was thus of the utmost seriousness.

### B.   Taylor's History and Characteristics

Russell Taylor, age 42, is a father of three minor children. PSR ¶ 107. He has been married for 20 years and has a long and successful employment history as a businessman and entrepreneur. *Id.* at ¶¶ 126–135. He has no criminal history and no history of substance abuse. *Id.* at ¶¶ 120–121.

Taylor's cooperation with law enforcement, as described above, was significant, and

Taylor undertook this cooperation despite the personal risks involved in doing so. Taylor understood that his decision would not only sever his relationship with former associates but expose him to potential harassment and threats as well. Taylor set these concerns aside, cooperated with the Government, and testified publicly in court—in a trial against a defendant who peddled hostile conspiracy theories about Taylor in rambling court filings and on various internet platforms. Taylor's contributions, particularly under these circumstances, should be reflected in the sentence imposed by this Court.

### C.     The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law

Taylor's criminal conduct before and on January 6 is undeniably serious: Taylor planned, over many weeks, to bring weapons to Washington D.C. and to come to the Capitol—on a day that is meant to mark the peaceful transfer of power—prepared to fight. Further, he organized others to do so, and in acting in concert with others, he served as a force multiplier in the threat that was gathering and that would culminate in the attack on the Capitol.

Since January 6, Taylor has provided substantial assistance in the Government's efforts to hold accountable those responsible for historic crimes. He testified in public in Hostetter's trial and acknowledged under oath that he and Hostetter agreed to, and did, commit serious crimes. A sentence that not only takes into account the seriousness of Taylor's conduct, but also his cooperation with law enforcement, will promote respect for the law by demonstrating to persons who have committed crimes the potential benefit of taking responsibility for their actions.

### D.      The Need for the Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

Equally important here is that future actors may also look to Taylor's decision to enter a cooperation plea and testify in a public trial to his crimes and those of others. The Court's exercise of a downward departure here could send an important message that may deter others from joining a conspiracy or encourage others to abandon a conspiracy and expose its existence to authorities.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence also weighs in favor of a term of incarceration. Although Taylor, following his arrest, chose to accept responsibility and assist the Government, his statements after January 6, when he was asked what happens next and he responded, "Insurrection," Taylor SOO ¶ 38, were those of a man girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble . . . It came when he realized that he could go to jail for

---

[12] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

The Government's proposed sentence would not create any unwarranted sentencing disparities.[14]  The offense conduct calculation recommended by the Government is consistent with the Government's recommendations in January 6 cases, particularly its recommendations for the small subset of rioters who have been charged with conspiring to obstruct the certification proceeding. Further, the Government has consistently maintained that the January 6 defendant whose conduct is most analogous to Taylor's conduct is his co-defendant, Alan Hostetter: before Taylor's guilty plea was entered, the Government contended that if trial of the six co-defendants were to be severed, it would be appropriate for Hostetter and Taylor to be tried together because they had worked closely together before January 6 (and they were side-by-side for most of their criminal conduct during the attack on the Capitol). *See* ECF No. 183. In sentencing Hostetter, the Court applied enhancements for aggravating role and extensive planning. The Court's sentence of 135 months' imprisonment represented the top of the applicable sentencing Guidelines for Hostetter. The Government submits that, before accounting for his substantial assistance, Taylor's offense conduct similarly warrants a top of the Guidelines range sentence.[15]

The Government's recommended sentence here reflects Taylor's timely plea and significant assistance to the Government, which places him in a fundamentally different category

---

[14] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[15] Taylor's guidelines range of 70–87 months differs from Hostetter's guidelines range of 108–135 months principally because Hostetter received a two-point enhancement for obstruction of justice (for lying in his testimony) and Taylor received a three-level reduction for acceptance of responsibility.

than Hostetter. In that respect, one useful comparator—even if not a direct comparison—is the case of Charles Donohoe, a former member of the Proud Boys leadership who was sentenced to 40 months' imprisonment by Judge Kelly in December 2023. *United States v. Nordean et al.*, 21-cr-175-4 (TJK), ECF No. 936 (Dec. 19, 2023). For his conduct related to the attack on the Capitol, Donohoe, like Taylor, pleaded guilty to one count of conspiracy to obstruct an official proceeding in violation of 18 U.S.C. 1512(k); Donohoe also pleaded guilty to one count of assaulting an officer in violation of 18 U.S.C. 111(a). The court found that Donohoe's offense conduct warranted a two-level enhancement for extensive scope and planning and a three-level enhancement for aggravating role, which are enhancements that the Government and Probation have recommended for Taylor as well. After analyzing the sentencing guidelines, the Court calculated an advisory guidelines range of 70-87 months, which the Government submits is the same Guidelines range that applies to Taylor before applying downward departure credit for cooperation. The court granted the Government's motion for a downward departure for Donohoe's substantial assistance in the Government's investigation and prosecution of members of the Proud Boys, including their leadership. In that case, the government sought a 50% reduction from the sentencing guidelines range, and the Court's imposition of a 40-month sentence was consistent with the request.

## VII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 1512(k) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require

a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Taylor has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The Guidelines fine range here is $25,000 to $250,000. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d); *see* 18 U.S.C. § 3572(a).

Probation has recommended that no fine be imposed because "although it does appear that [Taylor] has the ability to pay a fine, given that he faces a period of imprisonment, and his ongoing family obligations and responsibilities, a fine is not recommended." PSR ¶ 154.[16] The Government respectfully submits, however, that in light of Taylor's ability to pay a fine and the seriousness of the offense conduct, a fine of $25,000 (which would be the bottom of the Government's calculation of the applicable Guidelines range) would promote the rule of law while taking into account the factors cited by Probation that counsel against a higher fine.

## VIII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[17] The VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to

---

[16] The parties agreed in the plea agreement that Taylor is permitted to argue that no fine should be imposed. Plea Agreement at 4.

[17] The Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

Moreover, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Taylor must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6. Plea Agreement at 10. This amount fairly reflects Taylor's role in the offense and the damages resulting from his conduct. In cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging

property.[18]

## IX.    CONCLUSION

For the reasons set forth above, the United States recommends that the Court grant the

Government's motion pursuant to U.S.S.G. § 5K1.1 and impose a sentence of 52 months'

incarceration, 36 months' supervised release, a $25,000 fine, and $2,000 restitution.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _/s/ Jason M. Manning_
JASON M. MANNING, NY Bar No. 4578068
ANTHONY W. MARIANO, MA Bar No. 688559
Trial Attorneys, Detailees
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 514-6256
Jason.Manning@usdoj.gov
(202) 476-0319
Anthony.Mariano2@usdoj.gov

---

[18] Taylor's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 179.