## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA: | CASE NO. 21-CR-392 (RCL) |
| | |
| | **DEFENDANT TAYLOR** |
| v. | **SENTENCING MEMORANDUM** |
| | **AND SUPPORTING DOCUMENTS** |
| RUSSELL TAYLOR, Defendant | |
| | **HONORABLE ROYCE C. LAMBERTH** |
| | **UNITED STATES DISTRICT JUDGE** |

## STRAIGHT TO THE POINT

Mr. Taylor is asking this Court for a Probationary Sentence with an appropriate amount of Home Confinement. While it is all too common for defense attorneys and prosecutors for the executive branch to exaggerate their recommendation, down or up, Mr. Taylor submits this is a responsible request and not hyperbole given his very specific and unusual circumstances. We shall elaborate below.

The USSG Sentencing Guidelines are the loadstone of the sentencing process[1] and Mr. Taylor expects this Court will look to the Guidelines as it has in comparative cases. But Mr. Taylor also understands that it was the dissents in *Booker* by Justice Stevens and Justice Scalia that remind us that both predictability and control of extreme disparity are essential variables that this Court might choose to consider as well. At the same time the remedial majority of *Booker* grants this Court power to specifically look at the character of Mr. Taylor for it its final decision. The totality of the circumstance suggest Mr. Taylor is the optimal candidate for a probationary sentence and this is not a "split the difference" type resolution considering the overreaching requests of the government. The real range of possible sentence, if the Guidelines are to be

---

1  The Defendant will forego the usual boiler plate *Booker* language knowing that this Court knows the law and does not need another rambling brief filled with useless and repetitious language.

properly considered is probation to 27 months, not the governments outside the Guideline request of 52 months.

Mr. Taylor, having plead guilty to one count of 1512 (k), believes his base Guideline is a 15 or 16 as suggested in the PSR. The government appears to have adopted a significantly higher number ignoring recent rulings and the case law – we shall visit on this later.

Mr. Taylor reserved the right to challenge the application of USSG §3B1.1(b) in the Plea Agreement and argues he is an organizer not a manager and should receive 2 points not 3. This is the only dispute with the PSR.

The government has also filed a motion under USSG §5K1.1 on his behalf. Given his substantial assistance, which this Court has personally seen, there should be a further reduction to a level well below 15/16. The governments recommendation appears to be stingy considering the cooperation of Mr. Taylor over the past three years. But even if the Court accepts the disappointingly low 4 points recommendation Mr. Taylor arrives at a level 12 within Zone C. This creates a range of probation to 16 months.

Mr. Taylor seeks a probationary sentence, born of the Guidelines, which considers a further departure or variance for a severe medical condition and a potential downward variance for certain factors under USSG §3553 which demonstrate that Mr. Taylor is unique amongst the many January 6th defendants in his acceptance of responsibility, cooperation, and rehabilitative behaviors since 2021. Accordingly, Mr. Taylor requests the following reasonable sentence:

36 Months of Probation
8 Months of Home Detention
$2,000 Restitution
200 Hours of Community Service
Mr. Taylor agrees with the PSR on the issue of fines
All other usual terms and conditions

## FOUNDATIONAL FACTORS

The following 10 foundational factors make up the basis for our position.

1. Mr. Taylor was never political involved before the events leading up to and on January 6th and since that day, he has not been involved in any activities that further the false narratives presented by far too many people and organizations.
2. Mr. Taylor immediately took honest responsibility.
3. Mr. Taylor 's extensive cooperation with the government at personal risk and personal financial costs associated with that cooperation.
4. Mr. Taylor settled the civil lawsuit directly filed against him related to January 6th at significant financial expense with money he had to borrow, corroborating his further remorse.
5. Mr. Taylor sought deeper insight and rehabilitation by participating in Citizenship Classes to remind him of the true value of being an American.
6. Mr. Taylor completed over 300 hours of Community Service.
7. A fair presentation of his character is attached in letters of recommendation.
8. Mr. Taylor served six days in custody and had an ankle monitor for approximately 430 days before this Court allowed it to be removed. He has had no violation nor pretrial failures.
9. Two specific acts of Mr. Taylor's on January 6th should be briefly noted.
10. Mr. Taylor has a severe medical condition, due to his large stature, which requires daily attention.

## A DECLARATION OF CULPABILITY

*"How many legs does a dog have if you call his tail a leg? Four. Saying that a tail is a leg doesn't make it a leg."*

*-Abraham Lincoln*

This Court has seen far too many defendants, and their supporters, insist that the events

of January 6th did not unfold as they did. Mr. Taylor is not one of them. Mr. Taylor makes a firm declaration that he does not seek to dispute his criminal behavior of January 6th. This day truly is a dark sport on the face of the nation we cherish and nothing in this Sentencing Memorandum should be viewed as an attempt to diminish the criminality of that day. We do, however, submit that Mr. Taylor is distinguishable from other defendants. Some defendants have continued to call January 6th a false flag, some go to trial and then later claim remorse, some have claimed to accept responsibility only to turn back to their vomit after they were sentenced, and some have truly accepted their proper part and sought rehabilitation. But scant few have done what Mr. Taylor has and then maintained their remorseful actions for over 3 1/4 years.

For the past three years and nearly four months Mr. Taylor has been steadfast in his admission of guilt of crossing those all too important lines.[2] Within a month of being charged he offered to meet with the government, and he has stayed the course since that day. He has not one blemish of turning away from his admission. For certain the Court has seen Mr. Taylor's sincerity in both his allocution and during nearly two days on the stand, under oath, testifying to his behavior.

It would be unfair to say that all his political beliefs have shifted, they have not. He still has a conservative based conviction of the "Shinning City on the Hill" view of America. But he does not believe that one should cross the lines that were crossed on January 6th. This type of action runs the risk of dimming the light, even for a moment, on what still is the greatest beacon of hope in human history.

On the day he faced the Magistrate Judge in California Mr. Taylor said "my heart broke as he read the charges against me because it was the United States of America vs Russell Taylor. I had hurt the very country I love."   But months before that day in Court, he had already begun to understand his failure on January 6th.

He has professed a straight declaration of his own guilty for crossing those lines from then until now. We ask the Court not to view anything in this Document as a desire to reduce that failure. Mr. Taylor adds the important word "please" to emphasis his acceptance of responsibility even as arguments are made below to demonstrate mitigation.

---

2  Of course, there has been an evolution of understanding. Mr. Taylor has had to process the charges, his actions, and the application of that law to understand completely his failures. But the point is he did the work and understands that failure.

## ACCEPTANCE OF RESPONSIBILITY

*"The great thing in this world is not so much where we are, but in what direction we are going."*

*-Justice Oliver Wendall Holmes*

It's one thing to be sorry once you're charged with a crime but something more to be repentant before actual prosecution begins. Mr. Taylor was not charged until June of 2021. In January Mr. Taylor had already begun to see how his actions were wrong. This led to an immediate dilemma with his job. His January 6th involvement could hurt the company and cost jobs. He was confronted with this issue and agreed to resign as C.E.O. knowing his staying might cost jobs.[3]

When he was initially charged Mr. Taylor was out of the State. He immediately returned and turned himself over to the F.B.I.. Within just a few weeks of his initial appearance his attorney reached out to the government to discuss both a plea and cooperation. From that moment he never wavered in his willingness to cooperate and plead guilty.

This on-going declaration is not to say that we agree with all the government's characterizations of the facts. We trust that the Court sees past rhetoric and looks to reality just as it did in the case of the co-defendants Warner, et al.

For over three years Mr. Taylor's actions indicate his direction is rehabilitative and not stagnate or rancorous. His actions are very different from that of his co-defendants or many other January 6th defendants. No words can be written that would explain better than Mr. Taylor's cooperative, remorseful, and on-going redemptive actions since January 6th.

## NO NEED FOR UNPRODUCTIVE REPETITION OF FACTS

Mr. Taylor chooses not to regurgitate the facts of January 6th which are all too well known to this Court. Your Honor has sat through hundreds of hours of testimony and video. By now the Court has the equivalent of a PhD in the events of January 6th. We do not feel the need to add to the Courts burden with additional hearsay-riddled statements, deleterious adjectives,

---

3  His former company had numerous business connections in the tech industry of Northern California, and it was felt his further employment could be politicized and hurt the company.

and biased opinions when the Court has obtained information "straight from the horse's mouth."[4]

Indeed, Mr. Taylor is the source of much of the information gained by the government that is now used against him.[5]  For example, the government had only suspicions that the axe was carried by Mr. Taylor in his backpack until Mr. Taylor told them he did. They also agreed it would not be used against him in their sentencing brief in the proffer agreement, but we understand that it came out in trial, from Mr. Taylors own mouth, so they either forgot or now feel it now is open for discussion. Either way it was Mr. Taylor that told them this fact in the spirt of cooperation and his quest for redemption.

While the government may also try to blend words that paint or taint the story, Mr. Taylor only asks the Court to recollect that in many ways it was his statements to the F.B.I. and the U.S. Attorney's Office, in numerous proffer sessions, his extensive plea agreement, allocution, and during his testimony in the Hostetter Trial that Mr. Taylor gives the greatest texture and details to his own guilt. While the government will certainly revisit these issues in their brief, and we might want to take an occasional exception to an interpretation or two, the facts are well settled. Debates of when things occurred, where Mr. Taylor was at certain times, and his attempts to obstruct, influence, or impeded the Certification of the Electoral College are well known to this Court.

Mr. Taylor notes that the governments brief is chock-full of some of the more radical statements of Hostetter and others and then attributed somehow to Mr. Taylor. This seems to be what they do in many of their January 6th briefs. While the PSR and the governments sentencing brief may re-tell the story they are, but a shadow of the direct light given from Mr. Taylor to this Court. We ask the Court to look directly at what it heard with your own ears and saw with your own eyes and make its evaluation of Mr. Taylor. The Court is also able to distinguish between Hostetter's behaviors of January 6th until now and Mr. Taylor's very different conduct and attitude toward his actions from then until now. Thus demonstrating how very different they are.

At trial Mr. Taylor testified while others asked the questions. Mr. Taylor accepted his

---

4 Justice Scalia noted in his Dissent in *Booker* "that Congress was so attached to having *judges* determine "real conduct" on the basis of bureaucratically prepared, hearsay-riddled presentence reports that it would rather lose the binding nature of the Guidelines than adhere to the old-fashioned process of having *juries* find the facts that expose a defendant to increased prison time." In this case the Court may be assisted by the governments brief and the PSR but the best and most authentic source is what your Honor has seen and heard directly from Mr. Taylor and others during multiple presentations.

5 Mr. Taylor gave up his fifth amendment right to remain silent fully understanding that everything he said could and would be used against him here and now in this very hearing – further evidence of his acceptance at a core level.

responsibility while others denied their acts. Over the course of two days of testimony Mr. Taylor's demeanor, directness, acceptance of responsibility, truthfulness, and cooperation were on display for this Court to evaluate. The Court already knows Mr. Taylor's errors, confessions, and attempts at redemption we are content to leave it in your hands.

## MR. TAYLOR COOPERATED

Mr. Taylor had hoped that this section would be short and reflect an agreement with the government's position of his cooperation as opposed to challenging it. Sadly, the government has seen fit to discount Mr. Taylors cooperation for whatever motives elude us.[6]

It is a given that the government makes no promises that when one cooperates, they shall receive any recommendations. Still, they took what they could use, and Mr. Taylor must trust them explicitly in anything they might say to the Court on this subject. At the same time there is a faith that when that letter arrives it will be fair and consistent with other letters of cooperation's. There is a cooperators belief that the more substantial the cooperation the more the government will appeal to the Court for a revaluation of the individual. After all there is an entire section in the USSG under section 5k1.1 and numerous Primers dedicate to this proposition.

But here the government seems to have lost its way and now leaves the decision of how to determine proper credit in the hands of the Court. An excellent reminder of why we have both criminal defense attorney's mandated in the Sixth Amendment to point out the inconsistencies and a seperate judiciary to balance the executive's branch's sometimes erratic behaviors.

The government's brief first appears to mark up their recommended sentence far beyond the PSR and the Guidelines and then sort of marks it back down – still well above the Guidelines. Then they try to sell it as a 40% discount when it really is a 100% increase (if the Court took the high end of a 16 Guideline of 27 months as its base)

The next afront is the recommendation of only 4 points for Mr. Taylors cooperation.   In 30 years of criminal defense Mr. Taylors attorney has never seen less than 6 points for defendant

---

6  This entire section had to be added on April 29, 2024 at 10:00 PST after Mr. Taylor had the chance to see the government's brief thus causing a near re-write of the entire Sentencing Memorandum of Mr. Taylor. It's now past 1:15 A.M. on the 30th but Mr. Huish is committed to having this to the Court before it opens on Tuesday the 30th.

who testified at trial but here the government suggests 4 points. Perhaps this is consistent with practices in the District and counsel is mistaken but it sure feels shallow.

Furthermore, it was not just his credible testimony. Below is a list of specific activities of cooperation by Mr. Taylor. Additionally, there were many times he received calls for information which he responded to directly and also requests to review exhibits or documents, which he always did. **Every flight, hotel and travel expenses were paid for by Mr. Taylor for every single trip.**

1. Taylor and Huish travel to D.C. and met AUSA/FBI agents - December 1 -3 2021.
2. Taylor was asked to review videos for the AUSA to discuss. He did so in preparation for next meeting. Estimated 8 hours or review.
3. Taylor and Huish travel to D.C. and met AUSA/FBI agents - February 12-15, 2022.
4. Taylor and Huish travel to D.C. and met AUSA/FBI agents - January 9-11, 2023.
5. Taylor and Huish travel to D.C. and met AUSA/FBI agents - April 18-20, 2023.
6. Taylor and Huish met with AUSA and FBI in Orange County May 24 and 25, 2023.
7. Taylor participated in <u>multiple calls</u> on unspecified dates in June of 2023 with AUSAs in preparation for trial.
8. Taylor and Huish travel to D.C. and met AUSA/FBI agents in preparation for trial of Hostetter July 3-8, 2023.
9. Taylor was also sent exhibits to review and prepare for testimony - which he and counsel did at great lengths on or around June 29, and then again around July 6, 7, and 8.
10. Taylor also met with AUSA's in or around late September and Early October for the Co-Defendant trial.
11. Taylor met on or about September 29, 2023
12. Taylor had at least one Zoom Call and a phone call of significant length.
13. Taylor then remained all call for that entire trial having to make and cancel numerous travel plans.

Furthermore, in the first meetings with Mr. Taylor the government made it clear that cooperation credit was unlikely given the nature of the case. Still Mr. Taylor persisted on meeting with them as a way to show remorse. Mr. Taylor's cooperation was both substantial and

demonstrates his attitude towards January 6th events. It informs the government and the Court that perhaps Mr. Taylor's behavior that day came from a different place than that of other defendants evidenced by his willingness to accept responsibility.

Mr. Taylor also desires to inform the Court of the unusual conundrum created by his cooperation. Those who still support the events of January 6th see him in hostile terms for his admissions and cooperation. He has been treated harshly by some people and had veiled personal threats. At the same time those on the other side of the issue shun him because he went to Washington D.C. in the first place. Mr. Taylor is on the Domestic Terrorist list and counsel has a reasonable belief that if he is given custody time, he will find no safe harbor and will be under the threat of physical danger. This is an added variable and a type of punishment that should be considered.

Further evidence of his ongoing value was demonstrated three weeks ago when the government cited Mr. Taylor's admissions as evidence against his Co-Defendant's by using his Statement of Offense ("for a short summary of the January 6, 2021, attack on the United States Capitol. ECF No. 197 at ¶¶ 1–7." )(ECF No. 452 P. 3) to enhance their Sentencing Memorandum against Warner, Mele et al.

One might also question the governments motives in the recommendation of 4 points as opposed to 5.   A 5-point reduction on a 16 is an 11 taking us in to Zone B. Of course, they still cling to their arguments which ignore the Brock case, but we will look at that later in the brief. how it reflects on him.

One final note: Mr. Taylor subjected himself to the questioning of the government and Hostetter but did not have the chance at questions from his own attorney. Certainly, there would be a softening of events and insights from those question. But this is not what happens when you cooperate, you open yourself to two hostile opponents and their questions and then step down from the stand. This too is the mark of cooperation and acceptance which should be considered.

## MASKS AND HIS VENTURE INTO POLITICAL PROTEST

Mr. Taylor was not a politically active man before the Covid-19 outbreak, nor has he been since January 6th 2021. While he does have strong patriotic feelings based upon deep religious sentiments, he had no real involvement with political activities or protests. That was

until the Covid Restrictions were instituted by Governor Gavin Newsom in California.[7]  With curfews, mask mandates, limits on movement, and prohibition of church meetings Mr. Taylor felt it incumbent upon him to protest what he believed were overly intrusive government orders that eliminated basic personal rights.[8]  His frustration led him to spontaneous Beach Church meetings where he first met Hostetter. This led to Covid protests which then morphed into concerns about the election and ultimately his acceptance of former President's Trumps calls to assemble on January 6th .

After Mr. Taylor returned from Washington D.C., he began to distance himself from Hostetter and others. Before he was indicted and after January 6th he was never again involved in any type of protest, rally, meeting, social media chat groups, or political gripe. Mr. Taylor saw Hostetter twice, briefly, face to face and talked to him but a scant few times. Hostetter was escalating his rhetoric and Mr. Taylor was headed in the opposite direction. After they were indicted in June 2021, Mr. Taylor never spoke to him, outside of this Court, again. Since June of 2021 Mr. Taylor has not done anything politically related, no anti-social activities, no protests, no chat rooms, nor on-going rants. Not once. Nor does he live in the fantasy that somehow January 6th activities were acceptable behavior. Never before, and never since.

## THE CIVIL SUIT

On August 26, 2021, "The Lawyers' Committee for Civil Rights Under Law" filed a lawsuit on behalf of seven Capital Police Officer who were injured on January 6th. That case is entitled Smith v. Trump et al (1:21-cv-00400) and assigned to Judge Amit P. Mehata. Former President Trump was deemed the lead defendant, and 25 others were lumped into the case, including Mr. Taylor. The plaintiffs are extremely well-funded by an unknown political group.[9]

---

7 The Court may recall Mr. Taylor testified to the draconian mandates in California. The Court was somewhat surprised to learn that California had instituted mandatory curfews during the Covid year amongst other extreme measures.
8 This order is issued pursuant to California Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120175,120195 and 131080; EO N-60-20, N-25-20, and other authority provided for under the Emergency Services Act; and other applicable law.
9 The Lawyers' Committee for Civil Rights Under Law have created a web site which outlines this case.
https://www.lawyerscommittee.org/smith-v-trump/

The case was brought under numerous novel and politically motivated theories. Mr. Taylor had no contact directly or indirectly with any of the named plaintiffs.

From the outset Mr. Taylor sought to resolve this civil case as another way to make amends for his participation on January 6th. Included are two letters from attorney's that participated in the civil suit and had occasion to observe Mr. Taylor's demeanor. The first is from Plaintiff's Counsel Edward Casper. (EXHIBIT 1). The second is from Attorney John Clifford who assisted in the mediation on behalf of Mr. Taylor (EXHIBIT 2). Both letters inform this Court of how Mr. Taylor, unlike everyone else in that case, sought to settle the matter from the outset. He was the only defendant to suggest mediation to Judge Mehta who then assigned Magistrate Judge Moxila A. Upadhyaya to the matter. Mediation was successful and Mr. Taylor agreed to a substantial settlement payment.[10]

Mr. Taylor also agreed to spend substantial time debriefing the Plaintiff's Attorney's. He has met with them personally and cooperated in their investigation in all ways requested.

The parties have agreed the dollar value of the financial settlement can be told to the Court and government under seal to protect plaintiff's civil suit and proceedings. Mr. Taylor had to borrow the money to make the payment. **The full sum has been paid.**

## CITIZENSHIP CLASS AND COMMUNITY SERVICE

*There can be no divided allegiance here. Any man who says he is an American, but something else also, isn't an American at all. We have room for but one flag, the American flag.*

*-Theodore Roosevelt*

One thing that seems to have been forgotten these days is that we are Americans first, and

---

10  The Following is an excerpt from Mr. Taylor Mediation Brief:  *"Mr. Taylor is not without a serious defense to Plaintiffs' claims. Plaintiffs have chosen an unusual course in lumping Mr. Taylor in with such an eclectic group of defendants. Mr. Taylors actions on January 6th did not directly cause harm nor injury to any individual. Furthermore, Mr. Taylor may have helped organized a group of people to come to Washington D.C. but the reality is that almost no one from his group showed up. There is no known connection between Mr. Taylor and anyone that caused any injury to any plaintiff on January 6th....Fundamentally, plaintiffs will have a serious challenge in proving a case against Mr. Taylor."*
.

not political parties. To reconnect with his citizenship Mr. Taylor enrolled in and completed the civic course which immigrants seeking naturalization must take. There he was reminded that America may have political parties (even though President Washington warned us against such) but it is our citizenship as Americans which should be prized above all. (EXHIBIT 3)

One of the most basic and essential elements of being an American is that we demand, as a national right, the peaceful transfer of power. Whether it is the local City Counsel or the halls of the White House, power must be abandoned for the newly elected. In his classes Mr. Taylor was reminded of this most critical function of citizenship. If one disputes an election, then we turn to the wisdom and independence of our Courts who review real evidence and seek to ensure fair play. These classes were a reminder of our Constitutional principles. One of his thoughts after taking the course:

> "*I had taken my citizenship for granted most of my life. I knew I loved my Country, but I did not realize what others did to become Americans. They study, sacrifice, and give up their past for a new future. This course reminded me of my good luck to be born an American. It also reminded me of why January 6th was so very unacceptable.*"

Mr. Taylor also participated in Volunteer Community Service as a means of giving something back while he awaited sentencing. He completed over 300 hours at South County Outreach distributing food to those in need. Attached is a letter from the organization demonstrating his willingness to serve and verifying his contribution. (EXHIBIT 4)

## **LETTERS OF REFERENCE**

It is customary to include letters of references to assist the Court in evaluating the individual. But what good are these letters if they do not come from well informed citizens? Accordingly, Mr. Huish gave each person a letter of instruction explaining their purpose and Mr. Taylor's official Statement of Offense (EXHIBIT 5). The recipients were asked to be fully versed with Mr. Taylor's criminal actions before writing the letter.[11]  We had more than 20 submission but chose a representative eight to avoid repetition. These letters give the Court

---

[11]  A few letters had been given to counsel, unsolicited, over the past few years. All were returned with instruction to read the Statement of Offense and make any changes they saw fit. No letters have been submitted to this Court that did not receive this packet.

honest insights into the character and remorse of Mr. Taylor. (EXHIBIT 6)

Perhaps the most insightful letter is from Mr. Taylor's wife, Deborah Taylor (EXHIBIT 7).   She was asked to discuss to Mr. Taylor's flaws as opposed to good characteristics. Mr. Taylor submits these letters as further evidence of his character, how he became involved with the January 6th events, his protective nature, and his quest for redemption.

## <u>TWO SPECIFIC ISSUES OF JANUARY 6TH</u>

**First:** We would ask the Court to remember that Mr. Taylor did not enter the Capital nor act on his statements or bravado. He stopped and used restraint – too late in some respects but not in others.

During the detention hearing in June of 2021, the Government sought to keep Mr. Taylor in custody. They presented essentially the same facts, photos, opinions, and arguments they have during these entire proceedings. Their current brief is fundamentally no different.   This Court reviewed those facts, photos, and arguments and made the following finding and thereafter released Mr. Taylor:

> *"Several facts, however, seriously undermine the government's ability to show an identifiable and articulable threat. First, unlike in Munchel, defendant did not go into the Capitol building on January 6. In fact, he declined to do so because he was carrying a knife. Second, six months have passed since the January 6 riot and defendant has not acted on his statement."* (ECF 16 P. 3)

Nothing has changed since June 15, 2021, except Mr. Taylor has now validated this Courts trust for nearly three additional years.

**Second:** There is one question never asked of Mr. Taylor during his testimony. Why did you have the weapons?

Mr. Taylor had been asked this question by the government numerous times over the

years and his answer was always the same.[12]  He told them that he took the weapons because he thought there would be a conflict with ANTIFA and felt he needed to protect others in such an event. He also added that they were not going to be stopped should ANTIFA instigate trouble.

Mr. Taylor had several contacts with Police on January 6th including being pepper sprayed directly in the face and the infamous and embarrassing photo of him flipping off the police as he walked past, but at no time did any weapon ever get removed nor used.

For most of his life Mr. Taylor, and well before this case, generally carried a knife. It was something he did daily, part boy scout, part functionality, part his protective nature, it was who he was (emphasis on the word "was".) Neither the knife nor the axe was ever removed on January 6th.  He admits he was wrong to have the weapons on to Capital grounds, he makes no excuse, but he does want the Court to know this one additional fact.

## USSG §3B1.1(b)

Mr. Taylor makes a singular argument under USSG §3B1.1(b) in that he was not a manager supervisor but rather an organizer and thus should only receive a 2-point enhancement. While Mr. Taylor did organize the online chats and certain meetings he was never in charge, and he never supervised nor managed anyone.

Mr. Taylor testified that Alan Hostetter was the leader and that he followed his instructions. Mr. Taylor stated that he always cleared everything through Hostetter. Mr. Taylor also testified that no one in his online chats showed up on January 6th except Hostetter, Hostetter's wife, and a Mr. Smith.[13]

As for "recruiting" this feels like an exaggeration or a result driven characterization rather than what was real. January 6th was a loose association of characters all acting with perhaps a single purpose and interconnected by that singular goal. While a few specific groups did coordinate an attack, others were linked through social media or texts. These groups were not

---

12 Perhaps the government did not believe this or felt like it was not helpful to their case. Whatever their tactical reason is not important. What is clear is that he told why he had the knife and axe. He mentioned the fear he had about ANTIFA in numerous pre-January 6th texts. He wore the knife in plain view and never removed any weapons. 13 As for the much-discussed American Phoenix Project this was nothing more than three guys doing an awfully lot of talking to themselves (Hostetter, Taylor and Smith). It may sound ominous, and Mr. Hostetter may have wanted it to be something more, but it never amounted to anything of consequence except what this Court has seen as it relates to Hostetter. They had no other members and Taylor and Smith were in and out within just a few months.

controlled organizations with a leader/s but more akin to the rants and ramblings of the masses.

Social Media is not managerial based but rather organic in that anyone can join or participate in a certain conversational group. Mr. Taylor may have started the technical links of the chat rooms, but he was not out recruiting. Instead, what he stated was that the Warner, Mele, Kinnison, et al jumped into the group on their own. The men discussed things each could do that day to communicate in the event of trouble. Unlike the Proud Boys or Oath Keepers the much discussed D.C. Brigade was a fancy group chat title not a real organization. Mr. Taylor was obviously organizing this group, but he had no control over any of them at any time. He had never met any of these Co-Defendant's before. On January 6th, he met them by chance on the steps of the Capital later in the day. Once together they took a few photos together and moved on. He did not exercise any control over them. He did not have a plan to receive a larger share of any fruits of the crime. Mr. Taylor feels confident postulating than there is not a single person that would say Mr. Taylor was in charge of them that day. But they all would agree he was a primary organizer of the communication network they all used. Thus, he was unmistakably an organizer, but not a manager.

The government also postulates in its brief that Mr. Taylor "led a mob that overran a police line on the inaugural stage and stormed the Capitol."   Perhaps the word "led" is how they want to view his actions but, in his testimony, photos, and videos Mr. Taylor was on the side of the balcony in the middle of the scrum that pushed against a barrier where Police were. He certainly was not in the front leading anyone.   But again we leave this to the Court who is still the best Judge of what it hear in trial.

## MR. TAYLOR HAS A MEDICAL CONDITION THAT SHOULD BE CONSIDERED

Mr. Taylor is man of large stature weighing over 425 pounds. He is built like an NFL lineman, but his extra-large frame does come with some serious medical issues. Primarily, Mr. Taylor suffers from extreme sleep apnea. Every night he is required to use advanced sleep apnea equipment or risk serious consequence which do include death. We submit his medical report to assist the Court in determining if a further departure is warranted.[14]  (EXHIBIT 8)

---

14  See, e.g., *United States v. McFarlin*, 535 F.3d 808, 810–12 (8th Cir. 2008) (variance to a sentence of probation was warranted in part based on the defendant's "poor health" and "need for medical care"); *United States v. Myers,*

## GENERALLY CASES SHOULD BE CONSISTENT IN SENTENCING HOWEVER, MR. TAYLOR IS DISTINCTIVE

U.S. Solicitor General Elizabeth Prelogar recent told the Supreme Court during oral arguments during the *Unites States v. Fischer* that the average 1512 (C)(2) convictions result in 24-26 months in prison. We take her at her word even if the government continues to seek to radically alter the average with novel theories. Mr. Taylor also notes that in similar cases before this Court, such as his Co-Defendants (except Hostetter), a Guideline Sentence without an upward departure or variance has been the norm.

As usually the government once again reached into its bucket of boilerplate briefs and has attempted to throw every noodle against the wall in the hopes that something sticks. They seek once again to circumvent the Brock case as if the Circuit Courts ruling and the District Courts sentences are invisible to them. Perhaps this is why they made not a single mention of the sentence of Warner, Mele, Kinnison, or Martinez.   But none of these overreaches should apply. Perhaps this is why the Solicitor General statement to the Supreme Court holds true to what the District Courts are deciding and thus demonstrate the proper range of sentences.

But in this case, Mr. Taylor has demonstrated that he not the average January 6th defendant but different in all he has done to accept responsibility, cooperate, and make amends where possible. A proper sentence, accounting for all he has accomplished, would be well below average and thus a type of probationary sentence as the Court deems appropriate.

## CONCLUSION

Crime must be punished but balance, rehabilitation, the improbability of re-offense, and the life well lived do become part of the calculus and wisdom that is required when a man is sentenced for his bad act. The selfish acts of January 6th do warrant punishment, but they may also be tempered for the right defendant. There has never been a time in our nation's history when the sirens song of a sitting President created such a rancor of bad acts. Should the Court be inclined, perhaps it might see a slight difference from those typical crimes, born of individual

---

503 F.3d 676, 687 (8th Cir. 2007) ("The district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence."). 223 See, e.g., United

greed, as compared to Mr. Taylor's foolish criminal act of January 6th when he accepted the plea of a man seeking to remain in power.

Accordingly, Mr. Taylor presents himself as a candidate for a probationary sentence. Probation is a well-worn old shoe that has proven to serve both society and the offender. It is a type of fitting sentence when wisely used and within suitable limits that fit this type of circumstance. Mr. Taylor's guilty conduct has come and gone, never to return but he will never shed the scars of this felony conviction. That also is a punishment.

While the crime that January day was tragic and caused this Country pain, so too is the application of the balm of mercy and reconciliation. A balm that can heal both the individual and a nation. The question is, will he perform as presented and be worthy of that balm?

Indeed, Mr. Taylor has proven to this Court that he is a dog that can hunt.


Dated April 25, 2024


Respectfully Submitted,
Law Offices of Dyke Huish


_____
Dyke E. Huish
Attorney for Mr. Russell Taylor

ADDENDUM 1
FAMILY PHOTOS



VOLUNTEER WORK





COACHING, SCOUTS, AND CHURCH







EXHIBIT 1

LETTER RE CIVIL CASE

PLAINTIFFS COUNSEL EDWARD CASPER

SHOWING MR. TAYLOR'S COOPERATION



LAWYERS' COMMITTEE FOR
# CIVIL RIGHTS
U N D E R   L A W

1500 K Street, NW          Tel:  202.662.8600
Suite 900                       Fax: 202.783.0857
Washington, DC 20005     www.lawyerscommittee.org

April 24, 2024

Senior Judge Royce C. Lamberth
c/o Dyke Huish
U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

*By Email*

Re:   *U.S. v. Hostetter*, No. 1:21-cr-00392-RCL
        Defendant Russell Taylor, resolution of the January 6 civil case against him

Dear Judge Lamberth:

As counsel for plaintiffs in a civil action brought against Defendant Russell Taylor based on the events of January 6, 2021, I write to apprise your honor of the resolution of all claims brought against Mr. Taylor in that case. The case is *Smith v. Trump*, No. 1:21-cv-2265.

My co-counsel and I represent eight U.S. Capitol Police Officers who were harmed by the January 6 attack on the U.S. Capitol. On August 26, 2021, we filed a complaint against 25 defendants for the harms caused by the Attack. The defendants included former President Trump, his campaign organization, militia groups, and about 15 individuals also charged as defendants in criminal cases. This included Russell Taylor and the five co-defendants in the above-referenced criminal case now pending before this Court. Attached to this letter is a copy of the Amended Complaint in *Smith*.

Mr. Taylor is the only defendant in *Smith* who has agreed to settle plaintiffs' claims against him. He answered the complaint and did not move to dismiss it. He engaged productively with plaintiffs, through counsel, in settlement discussion from early on in the litigation. Plaintiffs entered mediation with Mr. Taylor in June 2023 with Magistrate Judge Moxila A. Upadhyaya. Mr. Taylor and his counsel engaged with plaintiffs over the course of several hours, in what I believe to have been a genuine effort to settle the civil claims against him on terms that would be mutually agreeable to all parties. Ultimately, these efforts were successful.

The settlement agreement called for a settlement payment to address plaintiffs' injuries, and Mr. Taylor has paid that amount in full. I understand from Mr. Taylor's counsel that Mr. Taylor had to borrow some money to settle this matter, and so the parties agreed to a few months of additional time to close out the financial aspects of the civil case.  All of the money from Mr. Taylor went to the plaintiff Capitol Police Officers to assist them in their recovery from the events of January 6; none of it went to plaintiffs' counsel, who are representing plaintiffs pro



1500 K Street, NW
Suite 900
Washington, DC 20005

Tel:  202.662.8600
Fax: 202.783.0857
www.lawyerscommittee.org

bono. In addition to the settlement payment, Mr. Taylor agreed to be interviewed in person by plaintiffs' counsel about the events of January 6. He sat with us for the better part of a day and answered all our questions.

The plaintiffs in *Smith*, whom I represent, do not wish to speak to the type of sentence that may be appropriate for Mr. Taylor. Indeed, Mr. Taylor's counsel has asked us not to comment on anything related to potential incarceration. We agree, however, that it would be appropriate to inform your honor of the circumstances related to Mr. Taylor's settlement of the civil claims against him.

It is fair to say that in his willingness to settle the civil claims against him on terms that would be meaningful and mutually agreeable, Mr. Taylor, so far, has been unique among the 25 defendants from whom the plaintiffs in *Smith* seek redress.

Sincerely,

Edward G. Caspar
Counsel for Plaintiffs in *Smith v. Trump*

EXHIBIT 2

LETTER RE CIVIL CASE

ATTORNEY JOHN CLIFFORD

SETTLEMENT AND RESGINATION OF MR. TAYLOR

**JOHN S. CLIFFORD**
**ATTORNEY AT LAW**
**Tel: (949) 306-9010**
**Email: jscesq@gmail.com**

Dear Judge Lamberth,

My name is John Clifford. For the last five years I have been the corporate attorney for Russell Taylor's former employer, Fusion of Ideas. I write at the request of Attorney Dyke Huish to provide the Court with my experience with, and impressions of, Mr. Taylor involving the settlement of the civil case entitled *Smith, et.al. v. Trump, et. al.* civil case: 1:21-cv-02265-APM (the "Civil Case"). I have read the complaint and plea agreement; accordingly, I am fully aware of Mr. Taylor's actions leading up to and including January 6, 2020.  As detailed below, Mr. Taylor's desire to acknowledge that he was wrong in the criminal matter is entirely consistent with his acceptance of responsibility in the Civil Case.

*Facts Preceding the Civil Case*

My primary contact for the business has always been Mr. Taylor's wife Deborah.  Prior to the capital riot, I knew Mr. Taylor as a well-educated and devoted family man who was a great support to his wife in the operation of Fusion of Ideas.

Within days of Mr. Taylor returning from Washington D.C., well before he learned he was being investigated, Mr. Taylor informed that he was concerned about what had occurred at the Capital. As a result, I was given the unfortunate task of allowing Mr. Taylor to resign from an otherwise successful and productive employment with Fusion of Ideas.

*The Civil Case*

Long after Mr. Taylor's separation from Fusion of Ideas, Mr. Huish asked for my assistance with the certain procedural matters, including mediation, in the Civil Case. It appeared from review of the case that a local D.C. law firm took up the cause of seven Capital Police Officers who were injured on January 6th.

While I believe that Mr. Taylor had several solid legal and factual defenses available to him in the Civil Case, Mr. Taylor was insistent that the focus of the Civil Case should be limited to reaching a settlement with the plaintiffs in the Civil Case as part of the process of making both amends and restitution.  As a result, rather than engage in motion practice, at Mr. Taylor's direction, Mr. Huish requested that the parties enter into mediation. It is my understanding that he was the only defendant to mediate with the plaintiffs.  During the course of the mediation, I was directly involved in the full and final resolution of the case with Magistrate Judge Moxila A. Upadhyaya.  My observation of Mr. Taylor was of a man who wanted to pay his debts and move forward.  Although I felt the total dollar value was too high, Mr. Taylor was insistent on reaching a settlement.  As a result, he agreed to borrow the money and, as of January, 2024, it is my understanding he has paid the agreed upon settlement amount to plaintiffs.

**JOHN S. CLIFFORD**
**ATTORNEY AT LAW**
**Tel: (949) 306-9010**
**Email: jscesq@gmail.com**

Candidly, I was initially reluctant to assist Mr. Huish and Mr. Taylor with any aspect of the Civil Case because of my strong personal feelings about the Capital riot.  Simply stated, I believe that the events of January 6, 2024 were wrong and that any attempt to interfere with the peaceful transfer of Presidential power harms the Republic. Before agreeing to provide assistance, I insisted on the opportunity of speaking to Mr. Taylor and letting him know my concerns. To his credit, Mr. Taylor not only listened to what I had to say on this subject, but he asked questions, expressed understanding and remorse.  I have no doubt as I write this that Mr. Taylor understands and regrets his actions. The reality of what occurred and the damage that January 6th brought to our country cannot be diminished.  However, watching Mr. Taylor take responsibility in the civil case is a stark contrast to those who continue to ignore or deny what took place on that dreadful day.  I believe that Mr. Taylor will avoid any sort of political activism in the future. I have no doubt that Mr. Taylor will not be returning to any sort of political activism.

I remain available to answer any questions or concerns.

Sincerely,

John S. Clifford
Attorney at Law

EXHIBIT 3

CERTIFICATE OF COMPLETETION

OF CITIZENSHIP CLASS

BRIGHMA YOUNG UNIVERSITY



**BRIGHAM YOUNG UNIVERSITY**

Department of Continuing Education
Independent Study
229 Harman Building
Provo, UT  84602-1514
(800) 914-8931
http://is.byu.edu

August 31, 2021

To Whom It May Concern:

This letter is being sent to verify enrollment for Russell Taylor. Independent Study students are encouraged to complete their courses as if they were under the same deadlines as regular students; however, they have one year from the date of registration to complete each course. Enrollment in Independent Study courses does not constitute any status of enrollment at Brigham Young University.

Russell Taylor is enrolled in the following course(s):

| Course Title | Enrollment Date | Expiration Date | Credit Hours |
|---|---|---|---|
| GOVT 041: American (U.S.) Government and Citizenship (Free) | Aug 31, 2021 | Dec 1, 2021 | 0.00 |

Because students have one year to complete their courses, Independent Study does not provide enrollment status. The BYU Independent Study DOE accreditation code is 003670. If you have any questions regarding the student's status, please do not hesitate to contact our office.

Sincerely,

BYU Independent Study
indstudy@byu.edu
(800) 914-8931



# You made it to the end! Congrats!

Was this a good course? Did you learn a lot?

If you would like to earn middle school, high school, or university credit by taking online courses, our catalog of over 500 online courses can probably provide what you need.

If you'd like to learn anytime, anywhere, and at any pace that is comfortable for you, browse our course listings in the Independent Study Catalog to learn more and enroll.

EXHIBIT 4

PROOF OF 300 PLUS HOURS OF

VOLUNTEER COMMUNITY SERVICE

April 16, 2024

Re: Character Reference for Russell Taylor

Dear Judge Lamberth,

I am writing this letter as a Board Member of South County Outreach, where I have had the distinct pleasure of working alongside Russ Taylor for over a year. It is with great honor and respect that I provide this character reference to highlight Russ Taylor's exceptional contributions, work ethic, and unwavering commitment to serving our community.

Throughout his time with us for almost 2 years, he has dedicated over 300 hours to driving our delivery truck, a critical role that involves retrieving food donations from local grocery stores. These contributions are fundamental to the operations of our food pantry, which serves numerous families in need across our community. Russ Taylor has shown not only reliability and dedication but also profound compassion in his efforts to ensure that these vital supplies reach those most in need.

Russ Taylor's commitment extends beyond the physical tasks required. He has demonstrated a deep understanding of the challenges many of our beneficiaries face and approaches his work with a heartfelt drive to make a tangible difference. His service, which he has generously given without expectation of remuneration, reflects a commendable selflessness and a genuine desire to contribute positively to the lives of others.

The extent and consistency of his service, especially considering it spans more than a year, are a testament to his strong work ethic and dedication. His efforts have not only been invaluable in terms of operational support but have also been inspirational to our staff and other volunteers. Russ Taylor embodies the spirit of community service and responsibility that we hold dear at South County Outreach.

We are truly grateful for Russ Taylor's dedication and are fortunate to witness his growth and impact firsthand. His actions have undoubtedly enriched the lives of many, providing not just food, but hope, to families facing hardship.

It is without hesitation that I recommend Russ Taylor for your consideration. His character and dedication are evident in every hour of service he has committed. As Russ Taylor stands before you, it is with a genuine hope that his positive impact and continued potential to serve the community are recognized and valued.

Thank you for considering this perspective on a truly remarkable individual. Should you require any further information, please do not hesitate to contact me.

Sincerely,

Board Member, South County Outreach

Community service

| Location Location | Representative | Date | Total hours | 394 | | |
|---|---|---|---|---|---|---|
| **South County Outreach** | Cassie Owens | 7/20/21 | 3 | | | |
| **South County Outreach** | Cassie Owens | 7/27/2021 | 3 | | | |
| **South County Outreach** | Cassie Owens | 8/5/2021 | 2 | | | |
| **South County Outreach** | Cassie Owens | 8/10/2021 | 3 | | | |
| **South County Outreach** | Cassie Owens | 8/17/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 8/31/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 9/7/2021 | 5.5 | | | |
| **South County Outreach** | Cassie Owens | 9/14/2021 | 3.5 | | | |
| **South County Outreach** | Cassie Owens | 9/21/2021 | 3.5 | | | |
| **South County Outreach** | Cassie Owens | 9/22/2021 | 3.5 | | | |
| **South County Outreach** | Cassie Owens | 9/28/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 10/5/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 10/7/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 10/12/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 10/14/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 10//19/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 10//21/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 10//26/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 11/2/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 11/9/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 11/16/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 11/30/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 12/7/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 12/14/2021 | 4 | | | |
| **South County Outreach** | Cassie Owens | 12/16/2021 | 5 | | | |
| **South County Outreach** | Cassie Owens | 12/21/2021 | 5 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **South County Outreach** | Cassie Owens | 12/23/2021 | 5 | | | |
| **South County Outreach** | Evan Colburn | 01/04/2022 | 5 | | | |

1

| Location | Representative | Date | Total hours | 39 4 | | |
|---|---|---|---|---|---|---|
| **South County Outreach** | Evan Colburn | 1/6/2022 | 5 | | | |
| **South County Outreach** | Evan Colburn | 1/13/2022 | 3 | | | |
| **South County Outreach** | Evan Colburn | 1/18/2022 | 5 | | | |
| **South County Outreach** | Evan Colburn | 1/20/2022 | 4 | | | |
| **South County Outreach** | Evan Colburn | 1/25/2022 | 4 | | | |
| **South County Outreach** | Fruit tree harvesting | 1/29/2022 | 4 | | | |
| **South County Outreach** | Evan Colburn | 2/1/2022 | 4 | | | |
| **South County Outreach** | Evan Colburn | 2/3/2022 | 3 | | | |
| **South County Outreach** | Evan Colburn | 2/8/2022 | 5 | | | |
| **South County Outreach** | Evan Colburn | 2/9/2022 | 4 | | | |
| **South County Outreach** | Evan Colburn | 2/17/2022 | 4 | | | |
| **South County Outreach** | Evan Colburn | 2/22/2022 | 4 | | | |
| **South County Outreach** | Danny | 2/24/2022 | 3 | | | |
| **South County Outreach** | Danny | 3/1/2022 | 4 | | | |
| **South County Outreach** | Danny | 3/3/2022 | 4 | | | |
| **South County Outreach** | Danny | 3/8/2022 | 4 | | | |
| **South County Outreach** | Danny | 3/15/2022 | 4 | | | |
| **South County Outreach** | Danny | 3/17/2022 | 3 | | | |
| **South County Outreach** | Danny | 3/29/2022 | 3 | | | |
| **South County Outreach** | Danny | 4/5/2022 | 5 | | | |
| **South County Outreach** | Danny | 4/12/2022 | 3 | | | |
| **Tavi fairy festival** | Stephanie | 4/28/22 | 3 | | | |
| **Tavi fairy festival** | Stephanie | 4/29/2022 | 4 | | | |
| **South County Outreach** | Cassie | 5/5/2022 | 2 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **South County Outreach** | Cassie | 5/10/2022 | 4 | | | |
| **South County Outreach** | Cassie | 5/17/2022 | 4 | | | |
| **South County Outreach** | Cassie | 5/19/2022 | 5 | | | |
| **Smugglers runs veterans experience** | Raptors and veterans | 2023 | 50 | | | |
| **Just serve baseball gloves** | Just serve | Nov 18, 2023 | 5 | | | |

2

| Location | Representative | Date | Total hours | 39 4 | | |
|---|---|---|---|---|---|---|
| **Nursery child care at church** | LDS church covenant hills ward | 2022-2023 | 100 | | | |
| **JUST serve - homeless shelter socks and blanket project** | Just Serve | January 2023 | 15 | | | |

3

EXHIBIT 5

LETTER FROM ATTORNEY DYKE HUSIH

GIVEN TO EACH INDIVIDUAL

ASKED TO WRITE A LETTER OF REFERENCE


THE STATEMENT OF OFFENSE WHICH WAS

GIVEN TO EACH INDIVIDUAL IS NOT INCLUDED AS AN EXHIBIT

BUT CAN BE REFERENCED AT CASE

1:21-cr-0392-RCL -   DOCUMENT 197 FILED 04/19/23

Law Office of Dyke Huish
26161 Marguerite Parkway
Suite B
Mission Viejo, CA 92692
949-837-8600

March 15, 2024

Dear Friend or Family Member:

I want to personally thank you for taking the time to write a letter on behalf of Russell Taylor concerning his criminal behavior of January 6th, 2021. These letters will be submitted to the Court so that Judge Lamberth will have a more complete picture of the character of Mr. Taylor. Before you write your letter, I would ask you to please review the attached Statement of Offense from the Plea Agreement of Mr. Taylor. It is important to keep in mind that what Russ did on January 6th at the Capital Building was criminal behavior and he has accepted responsibility and plead guilty for those actions. Some of you may have personal feelings, one way or the other, about that day but to best assist the Court, I would ask you to keep your letters focused on Russ.

Your letter should tell Judge Lamberth how long and under what circumstances you have known Russ. Please include comments for his reputation in your community and perhaps a story that illustrates his character. If you know, you may also include your impressions of how political active Russ was before January 6th, 2021, and since then.

Judge Lamberth is a well-respected and experienced Judge who will read each letter. He has read Russ's allocution and personally heard him testify in Court. Russ told the Judge what he did that day and has answered all the questions the government asked of him. There is no need to ask the Judge for any type of sentence or leniency. I would ask that your letters be between one and two pages only and signed with a blue pen and returned directly to me.

Please Address your letter to:

Judge Royce C. Lamberth
United States District Judge, District of Columbia

If you have any questions or concerns, please let me know. Thank you for your time and consideration.

Sincerely,

Dyke Huish
Attorney for Russell Taylor

EXHIBIT 6

LETTERS OF RECOMMENDATION

March 20, 2024

Dear Judge Lamberth,

We are the parents of Deborah Taylor, Russ Taylor's wife, so Russ is our son-in-law. Our relationship with Russ is very close, and we have known Russ since he was about 2 years old.  I am his mother-in-law that has some good things to say about her son-in-law.  And my husband agrees with me.

Russ has always been a creative, hardworking person with strong family and religious orientations.  He has consistently overcome various challenges in his life with a positive outlook for the future.  However, the event on January 6, 2001 affected Russ in a way never fully foreseeable.  Aside from the legal issues, he lost his job directly due to being in the press and at first was subject to a lot of ridicule by people around him for being there.  Then as he sought to take responsibility and help the investigators and prosecutors, he received even more anger and threats from people who did not want him to tell the truth about the mistakes made that day.

Russ chose to press forward and face his challenges in an honest, professional and courteous way. Since that unfortunate day on January 6, Russ decided to not challenge the system, but instead chose to be more serviceable and cooperative. He chose to state unequivocally that what happened was wrong.  He still believes that votes were poorly counted in the 2020 election, but he does not believe that the way that day went down on January 6 is acceptable.  He does not say much about politics or elections, but I do know he is sad that he will not be able to vote in the future.  But I also know he is willing to accept this as a consequence for his involvement that day.

Since January 6, 2001, Russ has dealt with enormous pressures and stress in his life, including financial loss, community humiliation, legal challenges and family indignity.  People can be very mean, and he has felt that a lot.  Even in the face of those consequences, he smiles and does his best to help the people around him. We have a good son-in-law, we really do.

On a personal level, Russ significantly increased his community service activities, becoming a Nursery Leader at Church (working with children 18 months to 3 years old on Sundays), participating in various ending hunger events (Harvest Pack and South County Outreach), becoming a leader in the Adventure Guides program for

young men and coaching Stoneybrook School boys basketball and local community youth football through the Matt Leinhart Football program.  And as a father of three young children, ages 12, 10 and 4, Russ has devoted considerably more time to their needs and development.

We have seen Russ exhibit significant remorse for his actions on January 6, 2001, and acknowledge that he was wrong to act the way he did.  As his parents-in-law, we have seen Russ suffer significantly for his actions and are proud of his subsequent efforts to step up and serve his community, church and family.

I understand we should not ask for a lenient sentence or talk about probation, but I think I can say that we hope you see how Russ is different than so many that have flaunted January 6th as acceptable behavior and that this will be a positive factor in your decision.  And yes, we hope that he does not need to go to jail because we do love him, and he will be missed by so many.


Thank you for your consideration.

Carole and James Barlow

Nathan Ure
24 Wildflower Place
Ladera Ranch, CA 92694

April 15, 2024

To Judge Lamberth:

My name is Nathan Ure and I am a member of the Ladera Ranch community. I understand the severity of the decision the court is facing in sentencing Russ Taylor. I respect the nature of the task and hope that I can share some character observations that could have a positive effect on the way he is seen by the court. I'm sure that there are many letters because he's loved by so many, but my perspective may be quite different because of diverging perspectives and lives.

I have known Russ Taylor in many different settings during the 6 years of friendship. I have known him as a neighbor, church congregant, in youth sports, businessman, and most of all friends. He is generous in every one of those areas. I became connected to him, his wonderful wife Debbie, and their beautiful children when I had a church ministering assignment to watch out for them. His kindness, openness, sincerity, and generosity warms the hearts of all he comes in contact with.

I have watched him coach my son in his sports with an enthusiasm so infectious I knew it really boosted him. I have older children and during holidays he employed them at his work.  They responded so well to the work cultural environment they experienced there. I referred a close friend to purchase a large order of holiday gifts and their experience with the creative design and implementation was just incredible. That's all-typical Russ.

What may be different, and brings me to tears, is that when I went through some very difficult moments in my life his huge heart has shown through yet again. I recently made the difficult decision to come out as a gay man in a very conservative and tight knit community. It's been harder than I could have imagined. There are some who have been there for me, and many who have receded from my life. But Russ? Not a moment of awkwardness, and just enthusiastic love. There were so many dark years that led up to this and the path has been harder than I ever could have imagined, but when it came to Russ, there was a huge bear hug waiting for me and ongoing expressions of love and concern for me.

I have a lot of thoughts about the tragedy of what he got caught up in on January 6th and I  have different political perspectives. I know he's well beyond the reach of some really bad ideas that gripped far too many people to believe. He's done with all of that now. I know it because he has said it to me in quiet private moments that mattered. I have large responsibilities professionally in which I must judge character and honesty in a way that affects several thousand of my employees. I know with all my heart he's done with all of the nonsense that brought this calamity and will be the most upright of citizens.

We need him and his big heart to stay home. Be in the community. And love people. He loves everyone. That's who Russ Taylor is. He's inclusive. He's got a big heart. And he's ours. It would be a privilege to speak to anyone on his behalf.

Kind Regards,

Nathan Ure
nathanure@gmail.com
661-877-7937

April 15, 2024


To your Honorable Judge Royce C. Lamberth,


My name is Rene Romero, and I am a business owner who arrived in the United States in 2000 after fleeing my homeland, Venezuela, due to the communist regime's rise to power. Married for 50 years, with three children and four grandchildren, I have proudly called the great state of Massachusetts home for the past 22 years.

In 2001, amidst the trials of economic hardship in Doral, Florida, I crossed paths with Russ Taylor as a missionary. Russ was a beacon of support, both materially and spiritually, during our darkest days. He provided sustenance and wise counsel, helping me secure a job in Massachusetts and facilitating our relocation. Words cannot express the depth of Russ's generosity and dedication during our time of need. Through his unwavering assistance, I regained my footing and pursued the American dream with renewed vigor.

I vividly recall Russ, a young man braving Florida's torrential rain on his bicycle, offering solace and hope to my family. Russ Taylor's altruism knows no bounds, as he selflessly aids his community members without expectation of reward.

Despite any regrettable involvement in the events of January 6, Russ remains a pillar of responsibility, devotion, and familial love. His sole indulgence lies in his commitment to work and family, embodying the essence of a model citizen.

Russ has established a thriving business that not only sustains his family but also enriches the lives of his employees and community. His ethical practices and social responsibility set a commendable standard for others to emulate.

I wholeheartedly vouch for Russ Taylor's integrity and compassionate nature. His noble heart shines through in every action he undertakes.

Warm regards,


Rene Romero
37 Brookside Dr, Wilbraham, MA 01095
781-864-7547 or via email at rener03@gmail.com

Date:  April 14,  2024

To the Honorable Judge Royce C. Lamberth:


My name is Don Puls and I have known Russ Taylor for the past 6 years and he is a good friend of mine. Both Russ's and my kids attend Stoneybrooke Christian School in San Juan Capistrano, and our young sons are in the same YMCA Adventure Guides circle - Raging River. I regularly see Russ and have been on numerous camping trips and other events with him throughout these years. During this time, I've gotten to know Russ very well and can speak of his strong character and commitment to God, family, friends, and our country. I am especially grateful for our exceptional Raging River circle. Our circle's strong Christian and family values really sets us apart as we don't have any issues with alcohol, bad language, etc. that unfortunately can be common in other circles. I was thankful that Russ was also committed to these same values when he joined our Raging River circle.

Russ is a hard worker with a strong work ethic.  I have seen how once he is given a task he goes right to work.  Russ has an amazing family, very respectful, welcoming, and giving to his community. His family is a true testament to Russ's high morals and character. Russ also enjoys being the assistant basketball coach at our school which my son is on and we're thankful for Russ's time and commitment to the boys on this team.  He is a good example to all.

I realize that Russ was in involved in the January 6th event and was given his Statement of Offense to review.  He has never tried to downplay or push off his mistake as something that is acceptable.  Since he came back from D.C., he has expressed regret to me for his involvement and the impact and the consequences it has had on others and his family.  My observation of Russ is that he does not speak of January 6th like I hear others in the media.  To him it was a mistake and something that he regrets doing.  I have seen how his true focus is directed to his family, friends, and work.  I never hear him talk of politics. I can honestly say that in all the time I have known Russ, I have never seen him be violent or threatening to anyone.  Russ is a great family man giving back to his family, friends, and community.


Sincerely,

Donald Michael Puls
12 Mulberry Lane
Trabuco Canyon, CA 92679
Phone: 949-322-7050
email: don.puls@gmail.com

Dear Judge Lamberth:

My name is Chris Hulme. Russ is my brother-in-law and I have known him for over 20 years.

Now, you're probably thinking, I'm going to write a bunch of stuff about Russ just to try and help him out. But really, it's completely selfish of me, because I love him beyond words, and want to continue being allowed to spend time with him in the foreseeable future.

Not only is he my good friend, he's also a wonderful uncle to my children, and a valuable support to the rest of the extended family. When we get together, he's always bringing good energy, thoughtfulness, and love with him.

During Covid, we couldn't go to church because everything was closed, and Russ organized regular family sacrament services to lead the extended family in Sunday services from his home. During this time, he prioritized bringing the spirit of God into his home over other personal things he could have been doing instead. We didn't sit around and watch sports on Sunday. We spent quality time with the children, playing games, going for walks, and raising them to be wholesome people with meaningful experience to support them later in life.

On top of that, he got involved with Sunday beach church meetings, a few of which I went to with him. In fact, I'm pretty sure that's how he met Alan Hostetter, and definitely where I met him for the first time. At first, these meetings focussed primarily on God, the Bible, and those of us in attendance were gathering together to celebrate Jesus Christ and support one another in good Christian living. And looking back, I'll forever be grateful to Russ for inviting me to go with him… for it was a great alternative to having no church to go to at all (with everything else being closed).

Unfortunately, as time went on, I noticed that these beach church meetings began to serve as a place for people to voice their opinions on whatever most recent Covid limitations California had placed upon its residents. And the people in attendance were more than frustrated, feeling helpless in the situation. We all sensed something was wrong with the way Governor Newsom forced restrictions. And as Covid and mask restrictions became even more intense, I think Russ just become more and more concerned about what he could do to help.

Unlike any other time in recent US history, many of us felt our individual freedoms were under attack, and Russ in particular felt motivated to take a stand for what he felt was right… because he really felt it was wrong what was happening.

So, being the resourceful and properly motivated person he is, Russ helped organize events to promote patriotism and awareness around his opinions and views, many if not all of which were supported and enhanced further by others in the beach church group, including Alan Hostetter.

In fact, Alan Hostetter seemed to have a particular ability to get Russ's attention, and perk his interest. I never did understand that, being someone who he had only recently met… why was he so interested in spending so much time with him… organizing protests, and being part of whatever Alan Hostetter was otherwise currently ranting about. But I did see it, and wondered why it seemed like the energy around politics, the lock downs, mask wearing, everything being so weird and different across the country… it was all getting to people seemingly everywhere and with every visit to Orange County to visit family, it seemed I would sense things escalating the more time that passed.

At one point, I want to say right around the election, I learned how Alan Hostetter had changed his focus to the election results. Russ seemed to follow along with that as the group's frustrations seemed to flow from masks and curfews to the election. California can be aggressive in its willingness to place limits on people. I don't know what it felt like back east but out here it started to feel very controlling and uncomfortable. I think this was hard on the outgoing and social man that Russ is. And I'm guessing this is what got him more politically involved.

Now, I know (and so does Russ) that some of what happened, including what Russ did on January 6th, went too far. But I also know that much if not all of it was born out of the frustration from seemingly mindless mandates in California that grew as time went on, and extended further to leaving even more and more people with greater frustrations. For example, closing beaches on hot summer days so people couldn't be outside enjoying themselves. We even had to explain ourselves to the police once when we gathered as family at the beach because our group combined with a few families seemed too large, and someone reported us.

And so, many people felt our freedom was under attack. And it was our understanding that we were allowed to protest that opinion without any sort of recourse. And yet, if we were not for the mandates, I am confident Russ would not have left his family in California to travel across the country for an extended period of time… and he would not have been involved with the event of January 6th or anything related to Mr. Alan Hostetter. To be clear, I'm simply explaining my understanding of how what started out as an innocent interest in beach church led to escalating

discussions around frustrating mandates, abuse of political power, and loss of what most of us consider freedom and personal rights as citizens of the United States of America.

So, this explanation is not intended to be received as an excuse of any sort. It's just a clear observation of how one event led to the next from my perspective, having witnessed it on multiple occasions over the course of time.

Looking at this in a different way, I'd like to focus now on the man I know and love in hopes that it can help shed further light on who he is as a person, and not just how I think he got into this unfortunate situation.

Backing up a couple decades, when I first met Russ Taylor 20 years ago, it was back in the fall of 2004. His wife Debbie is my wife's older sister. And they were some of the first family member relatives of my wife I met shortly after the two of us began to get close enough to be considered serious together. More importantly, I was young, and a little nervous meeting her family, and yet, I will always remember how very welcoming Russ (and Debbie) were to me.

Even back then, before we knew one another too well, Russ would invite me on trips to the back country of Southern Utah. He always made sure we were well prepared with communications, food, and other items. He had our group of people lined up, place to stay, meeting location, etc. all pre-planned. In fact, I'd say Russ has always been a prepared sort of person. And he's always concerned about the people around him, especially when it comes to having a good time.

What's particularly interesting to note, I recall speaking with him about his trip to D.C. and if I understand correctly, he took a knife and two axes with him. It's weird, because I vaguely remember laughing about it at one point, and he may have already been in D.C. at that point... but to me, I laughed because it sounded funny, as in... not real that he would do anything with them. Especially since he's such a big guy, I couldn't imagine anyone doing anything to him... sort of reminds me more of the kind of guy who can walk down the street like Andre the Giant in "The Princess Bride" and have everybody get out of his way!

Still, if it helps, I'll just point out that he was always a big guy, and was always into weapons and warrior type stuff, and would go to festivals for medieval times, with people dressed in suits of armor, jousting, and being macho men of sorts. And I've been to some of these things, its cool, but Russ gets all into costume and really loves it.

So I don't think his intention was as much violence as just looking the part, and maybe there was a shred of self protection factoring in there too, because as a bigger guy, he's also an easier target... but I've never known him to use his size and stature in any way to intimidate or fight with others. Instead, he is protective and watchful. And I strongly suspect that it was no different on January 6th.

Another point of regard I have for Russ: we share many common traits. We're both entrepreneurial, charismatic, and full of love for life. Perhaps the most notable trait we share though is our love for family, raising them under God, and living with dignity to support and uphold truth with what is right.

And you know, Russ does not just claim religion. He lives it. He attends church every Sunday. Takes his kids to youth activities so they can have friends with common values and standards. He even helps take care of the little kids who all seem to love him. Russ shows how life can be lived with God at our side, so the younger generation can have something greater to look forward to besides themselves, in this often-challenging world around us.

All this aside... still wondering why I love Russ Taylor so much? He's also the one I enjoy talking with the most every time the family gets together. He has an ability to make whoever he is talking with feel loved and cared for at a deep level something which very few people can do. He listens. Asks good questions. Shows empathy. Reflects human emotion with real genuine interest and love. And makes you feel like you're worth more than you might otherwise think of yourself.

In short, Russ is the whole package. Sense of humor. Uplifting positive energy. Passion. Love. And a unique ability to inspire, encourage, lift, and motivate others.

The Russ Taylor I know and love, is the one who I see living an honest, upstanding, and good life. Seems to me he just got caught up in a moment with lots of surrounding negative influence, momentum and energy which unfortunately wrapped him up into circumstances that did not serve him well. The good news is though, I know he learned a huge lesson here. And I'm confident he'll never repeat the same mistake twice.

Here's the sort of thing you'll see Russ doing these days: Last Thanksgiving, after we all finished a huge meal, Russ rolled up his sleeves and cleaned dishes for hours while many others relaxed on the couch and played with the kids. Nobody asked him to. He just did it. And I know because I was right there with him drying the dishes after he washed

them. As we washed dishes, I thought about all the things Russ has done for me and others to lift us up and make our lives better. And the list is long: he's generously supported food banks with his time, organized a 5k run for the less fortunate, and cared for a lonely friend that had been going through a really hard time in her life by taking care of things she could not do for herself. I've been there on several occasions to witness this, and can attest to the fact that given the opportunity, Russ gets things done.

And after spending the last many years building a worthy life for himself and raising a top-notch, wonderful family, I'm certain he has touched the lives of countless people along the way and would never intentionally gamble this freedom to enjoy a life with anyone other than those people whom he loves most: his family. And I've seen first-hand how sad and sorry he is for what he did and I've been there to hear him talk about his deep desire to be able to be there for his family hereafter.

I do understand what Russ and others did was so very wrong and there will be consequences for those actions. But what I hope you will understand, Judge Lamberth, is that Russ Taylor, unlike so many other people who still cling to a weird belief that what happened was acceptable, regrets and has moved back to being the man he always was and is despite having this experience attached to his life history. And again, I'm not saying it is an acceptable excuse to get caught up in the moment, but I am pointing out that it is a mark of his good natured character to see that he has not stayed in that moment or sought to justify his failure that day.

Russ really is a great man and can continue to bring much good to this world given the opportunity. And I'd be honored to stand by him and help him in any such endeavor. He's a man worthy of anything good you can think to task him with and I'm confident he will not let you down if you give him a chance.

I know I am not supposed to speak about his punishment, but may I please add that whatever happens (and we all hope you please consider probation) I am confident you will not see him back in this Court or any other and we all hope you will consider his goodness as a small factor in your decision.

I'd be glad to answer any further questions about my statement and relationship with Russ should you wish to contact me.


Regards,

4/16/24

Chris Hulme

805-452-8353

To the Honorable Royce C. Lamberth, United States
District Judge

Dear Judge Lamberth,

I am writing on behalf of Russ Taylor.  He and I have been close friends for the past five
years. Our children attend the same school, which is where I first met Russ, and our
friendship formed from a shared passion for camping and outdoor adventures.

It is within this context that I was both troubled and surprised to learn of his
involvement with the events of January 6, 2021, and it is for this reason that I am happy
to write about Russ Taylor's character.

Russ is a loving father to his three children, and a committed and faithful husband to his
wife Debbie. I would trust him implicitly with my own sons. He shows care, respect, and
consideration for everyone and models unconditional love to his family in all
circumstances.  Russ is often worried about the people he knows and I think that being such
a big guy makes him feel protective about the folks around him.

Russ is exceptionally kind and generous. At Christmas, he hosts a toy drive through his
Smuggler's Runs off-road rally business, which in 2023 raised $5,000 in toys and
contributions to underprivileged families. Russ is the kind of guy who is always thinking of
others.  When I was between jobs, Russ gave me the opportunity to provide consulting
services to his former employer, Fusion of Ideas, to help support me until I was gainfully
employed again. He is also generous with his time, coaching our school's basketball team.
Each summer, his family hosts weekly pool parties in his neighborhood, and he regularly
hosts game nights at his house.

I know that Russ accepts responsibility and has deep regrets for his actions on January 6,
2021. He has acknowledged his guilt in the matter, and I am glad he made effort to cooperate
with the Court and the Prosecutors Office.  I hope this has added understanding of who he is
and what he cares about.

In consideration of his exemplary nature and no previous criminal history, I believe
wholeheartedly that Russ Taylor is an honorable man, a valuable and law-abiding member of
our community, and a good human being.

Thank you for your consideration in his case.

Christopher Donaldson

April 2, 2024

To Judge Royce C. Lamberth

Your honor, I would like to write and tell you about Russ Taylor.  I also want you to know that I read the Statement of Offense and I am aware of what Russ did on January 6th.  I also know he plead guilty and testified in Court even though many things he said made even more clear the mistakes he made that day.  I am proud of him for stepping up and trying to make amends when so many others refuse to do that.  I hope this letter will help you understand more about Russ outside of this bad decision.

I have had the pleasure of serving with Russ Taylor in our local church each week for the last two years. We volunteer together each Sunday watching and teach the 18-to-36-month children for the second hour of church so their parents can attend Sunday school.  As you can imagine this is a busy job and it is fun to see big giant Russ with all those little, tiny kids.  They sure do love him.  Russ brings the fun and spirituality to the kids each week by leading them in singing, coloring, bringing the best snacks, and even musical instruments class. Not to mention he has become a great friend to me and my family on a personal level.

Each week, the kids come running into church nursery excited to see Russ knowing it will be an hour to remember. Being musically talented, Russ leads them in drumming, singing, and dancing in a group. When the kids see him in the hallways, they come running up to him excited to see him.  When he is gone, they sure do miss him.  Is it okay to say we all hope he is not gone too long, if at all?

We all know there are consequences for bad choices, but Russ is an example to us all in how to try and repair his bad choice.  I for one hope I am never defined by my worst day but if that happens, I hope I can recover and try and shine how Russ has tried to fix what can.  In all honesty, Russ Taylor is one of the best guys I know. I see him putting his family and others first and above all.  He is the person I call if I need anything, and I know he will be there.  I hope these little words help you better know Russ.

Sincerely,

Chad Nielsen
Vice President of Operations for PACS
Home address: 31 Pisano St, Ladera Ranch, CA 92694
Cell number: 909-418-7293
Email: chadtnielsen@gmail.com

March 24, 2024

Dear Judge Royce Lamberth,

I am lifelong friend of Russell Taylor, whom I have known for over 31 years. We met at age of 12 at a church activity through a shared connection of family, God, and sports. In our teen years, we remained close despite playing football against each other as we attended rival high schools. He was a big guy even back then, but he always had an equally big heart.

We were active in our student councils, scouts, church and serving our community. I recall doing many service projects that Russ started. We worked at local food banks and cleaned the yards for elderly and disabled people. His genuine compassion and willingness to lend a helping hand make him a cherished friend to all those who know him.

This may sound surprising, but I believe that part of the reason Russ was so involved with the mask protests and then going to D.C. on January 6th is because his deep sense of serving others became misguided and might have been taken advantage of by people who took that willingness to serve and used it for their own purpose. I am not making any excuses for his bad acts, and I read his Statement of Offense, but it strikes me, as one who has known him his whole life, that Russ did what he always does - care for the people he is asked to care for and put things together when called upon. In too many ways his sense of service also makes him a bit gullible and susceptible to anyone that might take advantage of that good nature.

Russ is also a devoted husband, he prioritizes his love for his wife, Debbie, through communication, compromise, and an unwavering support for her. It was amazing to witness both him and his wife work together for many years in building a successful company. It was sad to see how his bad choice cost him his old job as well.

His devotion also continues to his three children. He is a committed, hands-on dad, actively involved in each of his kids' lives. From coaching their sports to school pick-ups, to spending time with them at home and on vacations, he is present and engaged. He's been a great provider for his family and has taught his kids the same core values that were instilled in him.

Despite the immense challenges Russ has faced in the last couple of years, he has continued to persevere and has faced the days with grace and resilience. Surprisingly, many have criticized him for cooperating with the Court and pleading guilty. At the same time, he has often been vilified and even threatened for what he did by others. But Russ has stayed true to correcting what he could and trying to right the ship so to speak. I admire him for this.

Respectfully,

Benjamin Smith
3848 Mitchell Dr.
Santa Clara, UT 84765
bensmithhomes@gmail.com

EXHIBIT 7

LETTER FROM DEBBIE TAYLOR

WIFE OF MR. TAYLOR

April 12, 2024

Dear Judge Lamberth,

My name is Debbie Taylor and I am Russ' wife.  I first want to thank you for being so direct and fair with Russ during these proceedings. For example, Russ had been on the ankle bracelet for almost two years.  He never complained, but as his ankle swelled, we became worried.  You graciously listened and then let him have it removed.  Those were a long two years, but I was grateful.  I also wanted to thank you for reminding him the day he pleaded guilty that you noticed how he was different from others by cooperating with the U.S. Attorneys on the case.  It meant a lot to both of us that we knew that you saw what he was doing.  He often spoke of how kind you were to everyone when he testified in Court.  Thank you.

Mr. Huish has asked me to write a very different kind of letter than I expected.  He has asked me to tell you some of Russ' bad traits as opposed to good ones.  He told me that it was important for you to know his flaws so that there would be an honesty to our all our letters.  I, more than anyone, know my husband's shortcomings and I guess it really does have to be me.  At first, I was frustrated by this request.  I only wanted to tell you how wonderful my husband is to me, my family, and our community, and how much I love him.  But I do understand that there is a truth to be told about Russ and I will do my best to be fair in this letter.  I hope both you and Mr. Huish will forgive me if good things still find their way out.

I have chosen to tell you three things about Russ that might be considered flaws.  The first is that he tends to be an overly enthusiastic follower.  The second is that he is not a deep thinker and can sometimes act rather than react.  The third is that he too often wants to protect rather than allow people the space to make their own choices.  I do think that all three of these traits contributed to him being before you in court, but I also truly believe there has been a lot of growth since January 6th.

Over our 25 years together I have learned that Russ tends to follow others more than he leads.  Which is odd because he is very good at putting things together and preparing.  But he sometimes tends to listen to others' ideas without considering the bigger picture.  A few years ago, he had several big business decisions to make.  They ended up going poorly because he followed others' lead rather than trusting his own intuition.  It cost him a lot of business and hurt for a time.  I am not even sure this trait has been as clear to either of us until this experience.  Russ appears to be in charge, but almost every time someone is pushing him in a direction.  Once he gets going, it is more about the task than anything else.  I believe this is part of what happened with Alan Hostetter.  He sure was a charismatic guy who really spoke deeply to Russ about the Covid restrictions.  Once Russ got behind that cause everything else seemed to follow – and so did my husband.  I am not making an excuse, I promise.  But Russ gained a great insight into why it is that he found himself at the Capital that day and he has grown.

Russ is not a deep thinker.  What I mean is he kind of moves to the end of the story rather than looking at the details and the groundwork.  I am not saying he is dumb; he is a smart guy.  But my husband often jumps to conclusions about things and once he is there, he is all in, trying to make it work.  He has a very strong moral center, and this can also taint his viewpoint from time to time.  He really would give up his time and money to make things work out, but as he has learned, the very hard way, you must make sure both the cause **and** the method are correct.  I have never been mad at him for some of his beliefs about the election, but he let his lack of thought move him beyond a protest into a position of embarrassing and hurtful behavior toward a Country I know he loves.  I am confident that his lack of deeper thoughts

and foresight left him thinking, at that moment (not now), that his acts that day were justified.  But no sooner than he came home he immediately understood how wrong he had been and has been trying to make amends since.

Russ tends to be overly protective.  My husband is a really big man and because of his size people often look to him for physical protection.  As an offensive lineman, he was tasked with protecting his teammates and I think this instinct has placed an unusual burden on him.  I do want you to know that Russ is never violent or even angry.  He really is a gentle giant, but he does think it's his job to protect everyone around him, and to be honest sometimes this is annoying.   It is annoying because nothing is happening and there is no need for protection, but Russ always seems to be worried about everything and wants to be able to protect others.  Again, I am not making an excuse, and I told him he didn't need to carry his knife in D.C., but he was always worried about Antifa possibly showing up and hurting some of the women and older individuals.  Especially when he had seen people first-hand attacked in DC in November when there for a rally.  I have no idea what he thought he would do if they did show up, but he thought it better to be prepared if something did happen.  This is so like Russ and so unnecessary.  Perhaps this is a bit of an "I told you so moment."   But may I add that after lots of conversations and deep searching of both our souls he better understands that this is not his job in life and there are times when you stay on the sidelines and let others do their jobs.

In the end, I am not so sure that Russ drastically has changed anything about himself because he has always been a good man trying to do the right thing, but I do believe that self-reflection and consideration of that January day's poor choices have refined him, taught him and helped him to be a better version of himself.  Perhaps to look both ways and then look again before following others, failing to think things to the end, or be everyone's bodyguard.

Russ is not a perfect man, but he is a very good man.  Russ does make mistakes, but he is quick to accept responsibility and seek to make amends.  Russ was never involved in anything political before the Covid restrictions and then January 6th and he has not been involved in any of it since except to do all the U.S. Attorneys asked him to do.

This failure of his to make the right choice on January 6th has been hard for us.  He settled the civil suit even though we had to borrow all that money. He's been trying to do the right thing ever since and make amends. Whatever you decide must happen to bring back the proper balance, we understand is necessary. But I know without a shadow of a doubt, that Russ will never be back in a courtroom before you.

Thank you for reading this letter and I hope this helps you better understand Russ.

Deborah Taylor

EXHIBIT 8

MEDICAL REPORT OF MR. TAYLOR

SHOWING SEVER SLEEP APNEA



**ResMed**

**Air**View™

MISSION SLEEP DISORDERS INSTITUTE
26800 CROWN VALLEY PARKWAY
SUITE 215
MISSION VIEJO, California 92691

Phone: 949-364-1236
Email: alexandra.kim@stjoe.org



TAYLOR, RUSS
DOB: 5/21/1981 (41 yrs)  Adult
MRN: 20016149450
CSN: 50577151397
Prv: MHM SLEEP CENTER PLAZA HSAT
Appt: 6/22/2022          EF#: 65053959

**06/23/2022**
**Taylor, Russ**

Patient ID: 20016149450
DOB: 05/21/1981
Age: 41

# Diagnostic Report

| Recording details | | | | | | 06/23/2022 |
|---|---|---|---|---|---|---|

| Device | | | | **ApneaLink Air** | Type: | **III** |
|---|---|---|---|---|---|---|
| Recording | Start: | **1:28am** | End: | **7:23am** | Duration - hr: | **5:55** |
| Monitoring time (flow) | Start: | **1:38am** | End: | **7:21am** | Duration - hr: | **5:43** |
| Oxygen saturation evaluation | Start: | **1:38am** | End: | **7:23am** | Duration - hr: | **5:42** |

| Statistics | |
|---|---|

80.8

| NORMAL | MILD | | MODERATE | | SEVERE | |
|---|---|---|---|---|---|---|
| 0 | 5 | 15 | | 30 | | |

| Events index | REI (AHI): | **80.8** | AI: | **65.4** | HI: | **15.4** |
|---|---|---|---|---|---|---|
| Supine | | | Time - hr | **5:40** | Percentage: | **99.2** |
| | REI (AHI): | **81.4** | AI: | **65.9** | HI: | **15.5** |
| Non-supine | | | Time - hr | **0:00** | Percentage: | **0.0** |
| | REI (AHI): | **0.0** | AI: | **0.0** | HI: | **0.0** |
| Upright | | | Time - hr | **0:02** | Percentage: | **0.8** |
| | REI (AHI): | **0.0** | AI: | **0.0** | HI: | **0.0** |
| Events totals | | | Apneas: | **374** | Hypopneas: | **88** |
| Apnea Index  Obstructive: | **63.4** | Central: | **1.2** | Mixed: | **0.7** | Unclassified: | **0.0** |
| Cheyne-Stokes respiration | | | Time - hr: | **0:00** | Percentage: | **0** |
| Oxygen desaturation | | | ODI: | **47.1** | Total: | **269** |
| Oxygen saturation % | Baseline: | **96** | Avg: | **87** | Lowest: | **58** |
| Oxygen saturation - eval time % | <=90%sat: | **70** | <=85%sat: | **32** | <=80%sat: | **16** |
| | | | <=88%sat: | **50** | <=88%Time - hr: | **2:52** |
| Breaths | Total: | **2164** | Avg/min: | **6.3** | Snores: | **2674** |
| Pulse - bpm | Min: | **43** | Avg: | **69** | Max: | **160** |

Analysis guidelines:     **Classic, Manual scoring**

Apnea[20%; 10s; 80s; 1.0s; 20%; 60%; 8%]; Hypopnea[50%; 10s; 100s; 1.0s]; Snoring[6.0%; 0.3s, 3.5s; 0.5s]; Desaturation[4.0%]; CSR[0.5].



**ResMed**

MISSION SLEEP DISORDERS INSTITUTE
26800 CROWN VALLEY PARKWAY
SUITE 215
MISSION VIEJO, California 92691

Phone: 949-364-1236
Email: alexandra.kim@stjoe.org

**Air**View™



TAYLOR, RUSS
DOB: 5/21/1981 (41 yrs)  Adult
MRN: 20016149450
CSN: 50577151397
Prv: MHM SLEEP CENTER PLAZA HSAT
Appt: 6/22/2022          EF#: 65053959

**06/23/2022**

**Taylor, Russ**

Patient ID: 20016149450
DOB: 05/21/1981
Age: 41

## Interpretation

Type III Unattended: Resp. Effort/SpO2/Pulse/Nasal Airflow
Based on 4% criteria     AHI = 80.8        SpO2 Nadir = 58%
Epworth Score: 10/24
Scored by: M. Packey, RPSGT, CCSH

PRELIMINARY INTERPRETATION: Consistent with SEVERE Sleep Apnea.

PLAN: CPAP is an effective treatment for obstructive sleep apnea and provides the patient, family and physicians an opportunity to assess its effect on the sleep-related complaints.

The Sleep Disorders Institute will arrange a CPAP titration as soon as possible. The patient will also be scheduled for a follow up appointment in the Sleep Clinic.

Bruce R. Tammelin, M.D., FCCP, FAASM, Diplomate, American Board of Sleep Medicine      DATE:



**ResMed**

MISSION SLEEP DISORDERS INSTITUTE
26800 CROWN VALLEY PARKWAY
SUITE 215
MISSION VIEJO, California 92691

Phone: 949-364-1236
Email: alexandra.kim@stjoe.org

AirView™

TAYLOR, RUSS
DOB: 5/21/1981 (41 yrs)  Adult
MRN: 20016149450
CSN: 50577151397
Prv: MHM SLEEP CENTER PLAZA HSAT
Appt: 6/22/2022          EF#: 65053959

**06/23/2022**
**Taylor, Russ**

Patient ID: 20016149450
DOB: 05/21/1981
Age: 41

## Graphs

| | 2:00am | 3:00am | 4:00am | 5:00am | 6:00am | 7:00am |

**Position**
Supine
Prone
Left
Right
Upright

Unclassified apneas
Obstructive apneas
Central apneas
Mixed apneas
Hypopneas
Desaturation
Snores
Cheyne-Stokes

**Oxygen saturation** (%)

| Baseline | 96 |
| Avg | 87 |
| Lowest | 58 |

**Pulse** (bpm)

| Min | 43 |
| Avg | 69 |
| Max | 160 |

Printed on 06/23/2022 - ResMed AirView version 4.35.0-4.0.0

Page 3 of 3



**Providence**
Mission Heritage
Medical Group

Mission Sleep Disorders Institute
26800 Crown Valley Pkwy, Ste 215
Mission Viejo, CA 92691

(949) 364-1236
psjhmedgroups.org

TAYLOR, RUSS
DOB: 5/21/1981 (41 yrs)  Adult
MRN: 2001614 9450
CSN: 5057715 1397
Prv: MHM SLEEP CENTER PLAZA HSAT
Appt: 6/22/2022                EF#: 65053959

### SLEEP QUESTIONNAIRE

## SNORING

- ☐ Mild
- ☐ Moderate
- ☒ Severe
- ☒ How Long? ( 25 years )

## SLEEP APNEA

- ☐ Stop breathing at night
- ☐ Witnessed by bed partner
- ☐ Awakened choking/short of breath

## SLEEP QUALITY

- ☐ Bedtime     ( 1:30 am )
- ☐ Wakeup time ( 7:30 am )
- ☐ Average # of hours sleep ( 6 )

## PREVIOUS SLEEP HISTORY

- ☐ Prior diagnosis of sleep apnea
- ☐ If YES date of last sleep study (_____)
- ☐ Prior use of CPAP
- ☐ Currently using CPAP/BiLevel/ASV

## PERSONAL INFORMATION

- ☐ Present weight ( 390 )
- ☐ Weight past 5 years (highest 390 lowest 380)
- ☐ Height ( 6 3 )
- ☐ BMI (_____) We will calculate
- ☐ Neck Size ( 19 )
- ☐ Hypertension
- ☐ Diabetes
- ☐ Stroke (CVA) or Cardiac History
- ☐ Mood disorder/forgetfulness/headaches
- ☐ RLS/PLMS

## SLEEPINESS SCALE
## EPWORTH INDEX

How likely are you to doze off or fall asleep in the
following situations?

  0 = No chance of dozing
  1 = Slight chance of dozing
  2 = Moderate chance of dozing
  3 = High chance of dozing

Sitting and Reading                              3

Watching TV                                      2

Sitting inactive in a public place              1

  (theater or library)

As a passenger in a car for one hour            1

Lying down to rest during day                   2

Sitting and talking to someone                  0

Sitting quietly after lunch                      1

  without alcohol

In a car, stopped at a traffic light            0

  TOTAL # POINTS                                10

5 mg  Melatonin

NAME: Taylor, Russ
DOB: 5/21/81
DATE: 6/22/22



**Sleep therapy report**

Taylor, Russ

DOB: May 21, 1981 (age 42 years)

AS11, SN 23222745304

## Mar 9, 2024 - Apr 7, 2024 (within 30 days)

| | | | |
|---|---|---|---|
| Average usage | 6 hours 24 minutes | Days used ≥ 4 hours | 27/29 (93.10 %) |
| Leak 95th % | 31.90 L/min | Days used ≥ 6 hours | 15/29 (51.72 %) |
| Average AHI | 5.56 events per hour | | |

### Usage hours

### Events per hour (AHI)

## Jan 9, 2024 - Apr 7, 2024 (within 90 days)

| | | | |
|---|---|---|---|
| Average usage | 6 hours 14 minutes | Days used ≥ 4 hours | 86/89 (96.63 %) |
| Leak 95th % | 32.35 L/min | Days used ≥ 6 hours | 46/89 (51.69 %) |
| Average AHI | 5.67 events per hour | | |

### Usage hours

## Apr 9, 2023 - Apr 7, 2024 (within 365 days)

| | | | |
|---|---|---|---|
| Average usage | 6 hours 25 minutes | Days used ≥ 4 hours | 358/364 (98.35 %) |
| Leak 95th % | 30.58 L/min | Days used ≥ 6 hours | 209/364 (57.42 %) |
| Average AHI | 5.77 events per hour | | |

### Usage hours



The content in this sleep therapy report is for informational purposes only. It is not a substitute for the professional judgment of a healthcare professional for diagnosis and treatment purposes. Always seek the advice of a physician or other qualified healthcare provider for any questions you may have regarding a medical condition. This report is provided "as is" and you are solely responsible for the use of this report.

**Patient Checklist**
Please check the following, and make sure all sensors are connected properly before going to bed.

_____ Cannula Sensor

_____ Respiratory Belt

_____ Oximeter Probe (Place on left/right index finger). Remove dark nail polish.

Note approximate time at lights out_____

Note approximate time at lights on _____

This ResMed ApneaLink Air Home Sleep Study Unit is the property of St. Joseph Health Mission Sleep Disorders
Institute

Please return the unit by 10:00 am \_\_\_6\_/\_23\_/\_22\_\_

**Patient Responsibilities:**

I, _R. Taylor_ ,was explained in detail on the proper way to
attach/secure all sensors and how to start and stop the device. I was also given written instructions and a
phone number (949.364.1236) to call if I had any questions.

I, _R. Taylor_ , also understand that I am responsible for the
full price of the home sleep study unit ($3000) and understand that this charge will be collected if the equipment
is not returned to our office by the agreed time above with no explanation; or if the unit is damaged beyond
repair.

_____ _____
Patient's Signature                                    Witness Signature

Thank You,

St. Joseph Health Mission Sleep Disorders Institute
26800 Crown Valley Pkwy, Ste 215 Mission Viejo, CA 92691

TAYLOR, RUSS
DOB: 5/21/1981 (41 yrs) Adult
MRN: 20016149450
CSN: 50577151397
Prv: MHM SLEEP CENTER PLAZA HSAT
Appt: 6/22/2022          EF#: 65053959

✚ **Providence**
Mission Heritage
Medical Group

**HST PATIENT FORM**

Pt. Name:
_Taylor, Russ_
Date of Service:
_6/22/22_
Unit Serial Number
_20195005154L_

MHMG-1104 (3/19)